[Crim. No. 22219. Mar. 27, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL RAY BURGENER, Defendant and Appellant.

506

508

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Supreme Court, James A. Uyeda and Michael Tanaka, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and J. Richard Haden, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—Defendant Michael Ray Burgener was convicted on one count of murder (Pen. Code, § 187)[1] with use of a firearm (§ 12022.5), one count of robbery (§ 211) with use of a firearm (§ 12022.5) and infliction of great bodily injury (§ 12022.7), and one count of being an ex-felon in possession of a firearm (§ 12021).

The jury fixed the degree of murder at first degree, found that it was committed during a robbery, and found that it was committed with express malice aforethought and with deliberation and premeditation. Under the 1978 death penalty law, a special circumstance that the murder was committed during a robbery (§ 190.2, subd. (a)(17)(i)) was found true, and defendant was sentenced to death. This appeal is automatic.

Defendant raises several claims of error at the guilt and special circumstance phase of his trial. We find merit in defendant's contention that the trial judge erred in failing to conduct an inquiry to determine whether one of the jurors was intoxicated during deliberations. However, we conclude

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

that under the circumstances of this case this error does not warrant reversal. At this point, any claim of jury misconduct defendant wishes to make would be more appropriately raised in a petition for habeas corpus. None of defendant's other claims of error is sufficient to reverse his conviction. We will therefore affirm the guilt and special circumstance findings.

Defendant declined to participate in the penalty phase of his trial and insisted that his counsel present no mitigating evidence, though such evidence was available. Defense counsel acquiesced. For that reason (see *People v. Deere* (1985) *ante,* p. 353 [222 Cal.Rptr. 13, 710 P.2d 925]), and because under the circumstances the jury may have been misled as to the nature of its sentencing task (see *People v. Brown* (1985) 40 Cal.3d 512, 540-541 [220 Cal.Rptr. 637, 709 P.2d 440]), we will conclude that the penalty judgment must be reversed.

## I.

### PROCEEDINGS BELOW

Early in the morning on October 31, 1980, William Arias, a clerk in a 7-Eleven store in Riverside, was shot and mortally wounded during a robbery. Arias died later the same morning. Acting on an informant's tip, the police arrested defendant Michael Ray Burgener and his girlfriend, Nola England, the same afternoon. At the time of his arrest, Burgener was in possession of a handgun.

### A. People's Case

Nola England testified that she had first met defendant in the summer of 1980.[2] By October they had become lovers and defendant sometimes spent the night at her apartment. Prior to the night of October 30, 1980, defendant had been unsuccessful in trying to find a job and had talked about committing a robbery. Nola told him they did not need money that badly.

Nola had purchased a revolver from Joe DeYoung. She had known DeYoung for about six years and had lived with him for two and a half years. She had never used the gun, but defendant had used it for target practice. At defendant's suggestion, they kept the gun buried in a flower bed outside the apartment. The bullets were kept in a marble bag under the bathroom sink. Defendant knew where the bullets were kept.

---

[2]Nola testified pursuant to an agreement with the district attorney. She pled guilty to being an accessory after the fact as defined in section 32 and was guaranteed probation in exchange for her promise to assist in the investigation of the case and to testify truthfully. Her attorney was present with her at the trial. Other charges were pending against her.

About midnight on October 30, defendant injured a finger on his left hand while moving furniture in Nola's apartment. They went to Riverside General Hospital to have his finger treated and got home about 2 a.m. Nola had taken Valium pills that afternoon and evening and testified that she was "loaded" by the time she got home from the hospital. She went to sleep.

Christine Boyd testified that on October 31, 1980, about 4:10 a.m., she stopped by the 7-Eleven store on Rutland in Riverside for her regular morning cup of coffee. From her car, she saw a White male carrying a paper sack leaving the store. She did not see his face, but believed he was White because she could see his hand illuminated by her headlights as she pulled into the parking lot. The man was wearing a cowboy hat and had shoulder length curly hair.

When Boyd entered the 7-Eleven, the clerk, William Arias, came out of the back room with blood running out of his mouth and told her to call the police because he had been robbed. She called the police and asked for an ambulance.

Riverside Police Officer Greg Dunn responded to the call at 4:14 a.m. Arias told the officer, "He shot me, he shot me in the face, in the back, in the stomach," then Arias began to lose consciousness. He died in surgery at 8:52 a.m. the same morning. The autopsy revealed he suffered bullet wounds in the face, shoulder, side, back, and buttock. He suffered neither defensive nor offensive marks and was healthy prior to the shooting. He died from loss of blood. The marks on his face indicated that he had been shot from a distance of less than 18 inches.

The assistant manager of the 7-Eleven arrived at the store about 4:30 a.m. She observed that the cash register had no money in it. Reconciliation of the register tape led her to believe that about $54 was missing.

Police officers located a bullet fragment in the back room. There were bloody footprints, all made by Arias. There was no indication of a struggle.

Nola England testified that sometime during the early morning hours of October 31, 1980, she was awakened by defendant who was sitting on the edge of her bed. He emptied a paper sack full of money onto the bed. Nola thought he said something about shooting at someone in self-defense. He also mentioned something about robbery and mentioned "one of those little stores" like Circle K or 7-Eleven.

Nola then went back to sleep. When she awoke again, sometime before 8 a.m., she and defendant went in defendant's car to visit Nola's methadone clinic and to pick up Joe DeYoung to get some speed.

The three went to Bob's Big Boy restaurant and defendant left for an appointment with his parole officer. While they were alone, Nola told DeYoung that the gun she had bought from him had been used in a crime and she wanted to exchange it for another one.

DeYoung testified that Nola told him that defendant had used the gun in a 7-Eleven robbery the night before and had killed someone.[3] DeYoung also said that Nola told him she had been at the store, but had not gone inside. DeYoung agreed to exchange the gun for Nola, but secretly telephoned the police from the restaurant.

DeYoung had previously worked as a police informant. About 2 p.m., he went to the police department and told Nola's story to Detective Harding. On Harding's instructions, DeYoung arranged to meet defendant and Nola at 4 p.m. to exchange the guns.

Nola and defendant were arrested at the appointed meeting place, at First and Main about 4:15 p.m. on October 31. Defendant had a revolver stuck in his waistband. This was the revolver Nola had bought from DeYoung. At the time of his arrest, defendant was wearing a cowboy hat which Boyd testified at trial looked like the hat she had seen on the man leaving the 7-Eleven store. At the time of his arrest, defendant's hair was "long." He was carrying a wallet containing $72.

The shoes defendant was wearing when arrested were subjected to a screening test for the presence of blood. The test was positive, although, in addition to human blood, the substances which test positive include animal blood, enzymes found in cabbage and horseradish, and some fecal material. There was an insufficient quantity of whatever was on the shoes to permit further testing. Screening tests on defendant's clothing were not positive for blood and none of the bloody footprints made at the 7-Eleven were from defendant's shoes.

The evening of the arrest, investigating officers searched Nola's apartment. In the trash under the kitchen sink, they found a brown paper sack with the 7-Eleven emblem on it. The sack had two $5 bills stuck inside a fold.

On November 4, 1981, a neighbor cleaning Nola's bathroom, located in the apartment's community hallway, found a marble bag containing thirty

---

[3]The Southland Corporation, owner of the 7-Eleven at which Arias had worked, gave DeYoung $2,500 after his testimony at the preliminary hearing, and was to give him $7,500 after his trial testimony.

.22 caliber soft-nosed copper washed bullets commonly known as "stingers." Other residents of the building had access to this bathroom.

Expert analysis and comparison of these bullets with the bullet fragments from Arias's body led to the expert opinion that both could have come from the same melt of lead.[4]

Ballistics tests run on the fragments taken from Arias's body and a bullet test fired from the gun recovered from defendant were inconclusive, but indicated that the fragments could have come from that gun.

Evidence of defendant's extrajudicial statements included the testimony of his parole officer, who said that on the morning of October 31, defendant told him he had been at the hospital until 4 a.m. In fact, it was stipulated that defendant was released from the hospital at 12:56 a.m., had picked up a prescription and then left.

Deputy Sheriff Richard Zavetz of the Riverside County jail testified that he spoke with defendant on November 5, 1980. At that time, defendant stated that he and DeYoung had committed the robbery together; that he had driven DeYoung to the store, where DeYoung got out and went inside. Defendant said he saw a man come out from behind the counter and go into the back of the store with DeYoung. He then heard four to six shots and DeYoung came out carrying a paper bag. He and DeYoung split the money. Defendant said that the gun DeYoung had used was the one DeYoung had sold to Nola. Defendant had given it to DeYoung prior to the robbery.

## B. Defense Case

Defendant testified that he never left Nola's apartment after returning from the hospital. He denied ever having discussed robbery with her. He asserted that his financial resources were such that he was able to keep up his car payments from August to October. Defendant's father testified that defendant had earned money by doing odd jobs for him, by working in a bookstore, and by doing day labor. In addition, both defendant's father and mother gave him money, a total of about $50 to $60 a week.

Defendant's father testified that he met defendant and Nola at the hospital the night of the crime. He testified that Nola appeared to be under the influence of drugs or alcohol. When defendant was ready to leave, they

---

[4]A typical manufacturer's order for a melt of lead would be one ton. One ton of lead would produce 500,000 bullets. Two different bullet manufacturers could have bought lead from the same melt of a lead supplier, although this is not likely.

discovered that his car had been hit in the hospital parking lot and the fender had been smashed. The fender had to be pried away from the tire before the car could be driven and, even then, the tire still rubbed. A repairman testified that the turning radius was restricted by 50 percent and the tire would hit the fender if the car went over a bump. A private investigator testified that the various routes from Nola's apartment to the 7-Eleven store measured from 7.4 to 9.9 miles.

Defendant testified that he and Nola arrived back at the apartment about 2 a.m. Both took Valium before going to bed. Defendant denied emptying a sack of money on the bed, denied telling Nola anything about a robbery, and asserted that he did not leave the apartment until the next morning.

That morning, defendant used his car to drive to Nola's methadone clinic, to DeYoung's house, and to the Big Boy. Defendant said that at DeYoung's house, DeYoung returned the gun which he had previously borrowed from Nola.

Defendant denied telling his parole officer that he had been at the hospital until 4 a.m., saying instead that he had told him he had been there until "early in the morning." In the afternoon, DeYoung called defendant and Nola and said that he wanted to exchange guns with her. When they went to the meeting place, they were arrested.

At trial, defendant acknowledged that he had lied to Deputy Sheriff Zavetz. He said he lied to implicate DeYoung who, he thought, had set him up. He testified that the bullets for the gun were kept in a cloth bag in the kitchen of Nola's apartment. He had never seen the marble bag or bullets of the type that were in the marble bag before.

## II.

### ALLEGED JUROR MISCONDUCT

After submission of the case to the jury but prior to the verdict, the court and counsel were notified that one of the jurors may have been intoxicated during a substantial part of the deliberations. The trial judge did not examine the juror to determine whether or not she was incapacitated. Defendant argues that his right to a trial by jury was thus violated.

The jury retired to deliberate on Friday morning, August 14, 1981, at 10:47 a.m. They were dismissed for the weekend at 4:40 p.m. Deliberations resumed at 9 a.m. on Monday, August 17, 1981. At 3:15 p.m., the foreman of the jury requested a conference with the judge. In chambers, with both

counsel present, the jury foreman told the trial judge that one of the jurors, Juror M., had been intoxicated on Friday and "her condition is the same today." The foreman, Alexis Olds, stated that she had dealt with people on drugs and marijuana, and that it was obvious that Juror M. was intoxicated. Four jurors had independently expressed concern to Olds and three of these had smelled marijuana on Juror M.[5] As evidence of the effect of Juror M.'s condition on her ability to participate in deliberations, Mrs. Olds stated: "She takes one little detail, and I have dealt with people who have been on drugs and marijuana, and she'll take on [sic] insignificant little detail and she'll go on and on. She'll repeat herself over and over and over. She'll make everybody else sit and look at her and then she'll catch herself and say, 'Okay, I'm together.'"

The judge consulted with counsel on how best to handle this problem. He suggested two alternatives: first that he call Juror M. into chambers for an examination, second that he substitute an alternate juror. Defense counsel demurred to both these suggestions, observing that any inquiry or admonition of Juror M. would single her out in the eyes of the other jurors and "destroy the jury." He also suggested that Juror M.'s ability to try the case might not, in fact, be impaired; that the fact that she "rambles" might be typical of her usual behavior, rather than a symptom of intoxication. Further, he commented that he had had a prior experience in which jurors "opposed to people on the jury" had insisted—possibly falsely—that a juror drank in order to get him excused. Ultimately, the judge suggested a third alternative: that the jury be admonished as a group against using intoxicants for the rest of the trial and allowed to continue their deliberations. Defense counsel agreed to this approach.

The jury resumed deliberations on Monday at 3:25 p.m. At 4:10 p.m., the judge admonished them on the subject of intoxicants and excused them for the night. Deliberations resumed on Tuesday at 9 a.m. On Tuesday at 10:25 a.m., the jury returned to court to have the instructions on entrapment repeated. Deliberations resumed at 10:30. At 11:25 a.m. Tuesday, the jury returned verdicts finding the defendant guilty on all counts.

In *People* v. *Lee Chuck* (1889) 78 Cal. 317 [20 P. 719], this court held that clear proof of the fact that a jury had consumed intoxicating liquors during deliberations in a capital case required reversal of a verdict of conviction, even in the absence of proof that any juror was actually intoxicated. Defendant first urges that his conviction must be reversed on the authority of *Lee Chuck*. Without commenting on the continued vitality of the *Lee*

---

[5]There was also an indication that Juror M. might have been drinking alcohol at lunch on Monday, although the transcript is not clear on this point.

*Chuck* rule, we simply observe that the record on appeal in this case is insufficient to establish that Juror M. had, in fact, used intoxicants during deliberations. For this reason, *Lee Chuck* provides little guidance for resolution of the issue presented here.

 Relying upon *People* v. *McNeal* (1979) 90 Cal.App.3d 830 [153 Cal.Rptr. 706], defendant next argues that the trial court erred in failing to conduct a hearing adequate to ascertain Juror M.'s condition and whether her ability to deliberate was impaired, and that this error requires reversal of his conviction. We agree that the court's failure was error. However, we are unable to conclude that this error warrants reversal.

In *McNeal,* after deliberations had begun, the jury foreman reported to the judge that one of the jurors had said she had personal knowledge of the case and that this knowledge would affect her vote. Defense counsel suggested that the foreman's statements required a formal hearing pursuant to Penal Code section 1120, so that the court could determine whether good cause existed to discharge the juror.[6]

Instead, the court questioned the foreman to determine the source of his information, and then conducted a cursory examination of the juror herself. The juror was not sworn and was specifically directed not to discuss factual matters. She was asked only whether she could set aside any "information outside the evidence" and decide the case on the evidence presented. When the juror answered "Yes," the jury was instructed to resume their deliberations. No other jurors were questioned.

On appeal, the reviewing court found the trial court's inquiry inadequate. The recorded statements of the foreman and the juror were sufficient to put the court on notice that improper or external influences were being brought to bear on a juror; and, under these circumstances, "it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of the other jurors has been affected." (*McNeal, supra,* 90 Cal.App.3d at p. 839.) Failure to conduct this inquiry was held to be reversible error.

The allegation of misconduct in the *McNeal* case implicated section 1120 which specifically requires a formal hearing with sworn testimony. No such

---

[6]Section 1120 provides: "If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial. If, during the retirement of the jury, a juror declare a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror."

allegation is presented in this case. Nonetheless, we conclude that an inquiry sufficient to determine the facts is required whenever the court is put on notice that good cause to discharge a juror may exist.

In reaching its conclusion, the *McNeal* court relied upon our state Constitution, statutes regulating the discharge and substitution of jurors, and earlier cases which did not involve section 1120 but which discussed the necessity for a complete, though summary, hearing where questions of a juror's ability to perform his duty are raised. These authorities compel the conclusion that a *McNeal*-type inquiry was required under the circumstances presented here.

The California Constitution guarantees the inviolate right to trial by jury. (Cal. Const., art. I, § 16.) "Among the essential elements of the right to trial by jury are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. [Citations.]" (*People* v. *Collins* (1976) 17 Cal.3d 687, 693 [131 Cal.Rptr. 782, 552 P.2d 742].)

■ Section 1123 gives the trial court the authority to discharge a juror "found to be unable to perform his duty."[7] Section 1089 provides for the substitution of an alternate juror in the event one of the original jurors is discharged.[8] The language of sections 1089 and 1123 is clearly discretionary, and section 1123 sets forth no procedure to determine whether a juror is unable to perform his duty. However, California cases construing these statutes have established that, once a juror's competence is called into question, a hearing to determine the facts is clearly contemplated. (*People* v. *Tinnin* (1934) 136 Cal.App. 301, 318-319 [28 P.2d 951]; *People* v. *Abbott*

---

[7]Section 1123 provides: "If before the jury has returned its verdict into court, a juror becomes sick or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged. If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged. If, after all alternate jurors have been made regular jurors or if there be no alternate juror, a juror becomes sick or otherwise unable to perform his duty and has been discharged by the court as provided herein, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may be again tried."

[8]Section 1089 provides, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

In *People* v. *Collins, supra,* 17 Cal.3d 687, this court discussed the procedures to be followed when a juror is discharged for cause after deliberations in a criminal case have begun. The judge is to substitute an alternate and instruct the jury to begin deliberations anew. We concluded that this procedure adequately protects the defendant's constitutional right to a unanimous verdict in a jury trial.

(1956) 47 Cal.2d 362, 371 [303 P.2d 730]; *People* v. *Manriquez* (1976) 59 Cal.App.3d 426, 432 [130 Cal.Rptr. 585], cert. den., 429 U.S. 1003 [50 L.Ed.2d 615, 97 S.Ct. 536].) Failure to conduct a hearing sufficient to determine whether good cause to discharge the juror exists is an abuse of discretion subject to appellate review. (Cf. *People* v. *Huff* (1967) 255 Cal.App.2d 443, 447-448 [63 Cal.Rptr. 317]; *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].)

In *People* v. *Huff, supra,* 255 Cal.App.2d 443, for example, the declaration of a mistrial on the basis of an officer's testimony that he had observed the defendant talking to two jurors during a recess was held to be an abuse of discretion. The appellate court in that case stated: "[T]he circumstances called for a hearing to determine what had actually taken place. Particularly apt here is the language of the court in *Mitchell* v. *Superior Court* [(1962) 207 Cal.App.2d 643, 650 (24 Cal.Rptr. 671)]: 'A jury should not be discharged in the absence of legal necessity, and it appears that in this case no attempt was made to determine that question and the decision was made by a judge not in a position to make such observation as would enable him to arrive at a proper decision.'" (*Id.,* at p. 448.)

"A 'good cause' determination in this context is one calling for the exercise of the court's discretion [citations], and if there is any substantial evidence supporting the decision, it will be upheld on appeal. [Citation.]" (*People* v. *Van Houten* (1980) 113 Cal.App.3d 280, 288 [170 Cal.Rptr. 189].) But once the court is put on notice of the possibility a juror is subject to improper influences it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and failure to make this inquiry must be regarded as error. (*People* v. *McNeal, supra,* 90 Cal.App.3d 830, 838-840.)

██ Here, the foreman's statements were sufficient to raise the possibility Juror M. was intoxicated during jury deliberations. If, due to the use of intoxicating substances, Juror M.'s ability to follow the instructions of the court, to deliberate, to render a verdict or otherwise discharge her duties was compromised, she ought to have been excused. (See *People* v. *Groves* (1961) 188 Cal.App.2d 785 [10 Cal.Rptr. 661, 7 A.L.R.3d 1034]; *People* v. *Maes* (1965) 236 Cal.App.2d 147 [45 Cal.Rptr. 903].) ██ It is beyond question that a criminal verdict rendered with the participation of a juror unfit for the proper discharge of her duty due to intoxication must be reversed. (*People* v. *Gray* (1882) 61 Cal. 164, 185-186; see also *People* v. *Leary* (1895) 105 Cal. 486, 491-496 [39 P. 24]; *People* v. *Deegan* (1891) 88 Cal. 602, 604-607 [26 P. 500].)

██ Alerted to the possibility that Juror M. was intoxicated during deliberations, the trial judge should have conducted an inquiry sufficient to

establish whether good cause for her discharge existed. He did not do so. This failure must be regarded as error.

Under the particular circumstances of this case, however, we cannot agree with defendant's contention that this error warrants reversal. As noted above, the record on appeal is insufficient to establish that Juror M. had actually used intoxicants or that her ability to deliberate was affected by them. The record contains only the foreman's unsupported assertion that Juror M. appeared intoxicated. The foreman's claim that four other jurors had expressed concern, while suggestive, is hearsay of limited probative value.

Juror M. was given no opportunity to explain her behavior, the trial judge conducted no examination to determine whether in his opinion Juror M.'s abilities were impaired, and no other jurors were questioned to ascertain whether they could corroborate the foreman's report. While we have no reason to doubt the foreman's sincerity, we also cannot conclude on this record that she was not mistaken or that she had not been prompted to act by other jurors motivated by annoyance at Juror M. rather than by concern for the integrity of the deliberative process.

In any event, the record on appeal sheds no light on the cause of Juror M.'s behavior. And in this case, unlike *McNeal, supra,* this lack of a record is the result of defense counsel's preference that the court conduct no inquiry.

In *McNeal,* defense counsel initiated the suggestion that the court conduct a full hearing pursuant to section 1120. Here, by contrast, the judge suggested such an inquiry but defense counsel expressed concern that questioning Juror M. would "destroy the jury" and intimated that other jurors might be conspiring to oust her because they did not get along with her. This record, while sparse and ambiguous, would support the inference that defense counsel's choice was tactically motivated; he may have hoped that the continued participation of Juror M., even if intoxicated, might result in a verdict favorable to defendant. Regardless of counsel's motives, however, defendant cannot be permitted to prevent an inquiry into the condition of a possibly intoxicated juror on the basis that such an inquiry would "destroy the jury" and subsequently challenge the verdict of that very jury on grounds that the court's failure to conduct an inquiry prejudiced his interests.

We do not suggest that, if defendant can produce evidence that Juror M.'s ability to discharge her duties as a juror was impaired, his conviction should

stand. Rather, we conclude only that the record on appeal is insufficient to evaluate a claim of juror misconduct.

In an analogous context, this court has noted that, where the record on appeal provides insufficient evidence to evaluate a claim of ineffective assistance of counsel, the conviction must be affirmed on appeal. *(People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) As the court in *Pope* explained, under these circumstances, such a claim is more appropriately made in a petition for habeas corpus. *(Ibid.)*

The same approach is appropriate in this case. Claims of jury misconduct may be raised in a petition for habeas corpus. (See, e.g., *In re Lessard* (1965) 62 Cal.2d 497 [42 Cal.Rptr. 583, 399 P.2d 39].) And in habeas corpus proceedings the opportunity for an evidentiary hearing will allow defendant's allegations to be more fully explored. (See §§ 1483, 1484.) If presented in a verified petition, an allegation of jury misconduct in this case would undoubtedly present a colorable claim entitling defendant to an evidentiary hearing at which defendant would be able to produce evidence of Juror M.'s condition and behavior. (See *Pope, supra,* 23 Cal.3d at p. 428.)

For these reasons, we decline to reverse defendant's conviction on this basis. As we shall further explain, no other basis for reversal of the guilt phase of defendant's trial exists.

### III.

### OTHER GUILT PHASE ISSUES

Defendant contends that the trial court committed various other errors: in refusing to appoint cocounsel; in limiting defense cross-examination of the prosecution's main witness; in admitting testimony of a state criminalist that defendant's shoes screened positive for blood; in admitting evidence obtained in a parole search; and in instructing the jury on the subject of express malice. We find no reversible error in any of these contentions.

### A. Refusal to Appoint Cocounsel

■ Defendant contends that the trial court's denial of his motion to appoint cocounsel under section 1095 denied him effective assistance of counsel in violation of the Sixth Amendment. We find no merit in this argument.

On November 4, 1980, the public defender having declared a conflict of interest, William Barnett was appointed counsel to represent appellant. On

April 1, 1981, Mr. Barnett noticed a motion to appoint second counsel pursuant to section 1095. The motion was heard on April 17, 1981. After oral argument by both sides, the motion was submitted. On April 21, 1981, the court summarily denied the motion. The trial began on June 29, 1981, with commencement of jury selection.

In his moving papers, defense counsel advanced an equal protection argument, maintaining that since two counsel were authorized under section 1095, it would be a denial of equal protection to refuse to appoint two counsel in the case of any indigent defendant. Counsel's only argument based on the specifics of this case was that there were "a couple of writs to be taken."

This court has considered claims for cocounsel in capital cases on two prior occasions. In *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], the trial court's summary denial of such a motion was approved. In *Jackson,* the plurality opinion stated: "[E]qual protection demands are satisfied by permitting the trial court, in its discretion, to appoint additional counsel at public expense if the circumstances in a particular case appear to require such an appointment." (*Id.,* at p. 287.) Summary denial— i.e., without a hearing to determine whether or not the appointment of additional counsel would have been appropriate to assure defendant a fair trial—was proper since defendant's counsel, "'without going into any detail,' merely relied upon 'the circumstances surrounding the case.' . . . Because defense counsel made no factual assertions which might have called for an additional hearing, the trial court was fully authorized to rule on the question based on counsel's argument alone." (*Ibid.*) In addition, counsel made no argument based upon lack of experience and "the trial court had full opportunity to observe counsel in the course of extensive argument on pretrial matters prior to its ruling upon the present motion, and accordingly was well positioned to evaluate counsel's ability." (*Id.,* at pp. 287-288.)

In *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108], on the other hand, this court ordered the issuance of a peremptory writ of mandate directing the respondent court to appoint a second attorney for the defendant in a capital case. The facts in *Keenan* showed defendant's attorney was appointed seven weeks prior to his scheduled trial date and defendant's motion for a continuance was denied. In the declarations accompanying his motion for additional counsel, defendant's counsel stated that he would have to interview 120 witnesses, that he anticipated extensive scientific and psychiatric testimony, that defendant was charged in 5 other pending criminal cases and the prosecution intended to offer evidence related to these cases at his murder trial. Counsel also stated that he intended to make numerous pretrial motions as part of the defense

effort and thought that review of some of these motions might be necessary. He asserted that only the assistance of another qualified attorney would be useful in this aspect of preparation. (*Id.*, at pp. 432-433.)

In *Keenan*, we stated that in a capital case, the appointment of an additional attorney "is not an absolute right . . . and the decision as to whether an additional attorney should be appointed remains within the sound discretion of the trial court." (*Id.*, at p. 430.) After noting factors to guide the trial court in exercising this discretion (the severity and finality of the death penalty, the importance and complexity of pretrial preparation in a particular case) (*id.*, at pp. 430-431), we found an abuse of discretion in the denial of the motion to appoint cocounsel (*id.*, at p. 434). "[A] second attorney is justified under the facts of this particular case, e.g., the complexity of the issues, the other criminal acts alleged, the large number of witnesses, the complicated scientific and psychiatric testimony, and the extensive pretrial motions, as to some of which review would be sought in the event of adverse rulings. . . . [¶] If it appears that a second attorney may lend important assistance in preparing [a capital case] for trial or presenting the case, the court should rule favorably on the request. Indeed, in general, under a showing of genuine need, and certainly in circumstances as pervasive as those offered by the attorney in this case, a presumption arises that a second attorney is required." (*Ibid.*, fn. omitted.)

*Keenan* did not disapprove *Jackson*, rather the former case cited the latter with approval. This fact, together with the fact that *Keenan* reiterates that the decision whether to appoint a second attorney remains within the trial court's discretion, clearly indicates that it was not this court's intent to mandate the appointment of a second attorney in all capital cases. Rather, some "showing of genuine need" is required. (*Ibid.*)

Neither the "factual assertions" standard of *Jackson* nor the "genuine-need" test of *Keenan* was met here. We conclude that the trial court acted within its sound discretion in denying defendant's motion.

### B. Denial of Right of Cross-examination

Defendant argues that the trial court erred in refusing to allow defense cross-examination of the prosecution's main witness on a subject which would have impeached her testimony.

Nola England was called as a prosecution witness. On cross-examination, defense counsel attempted to question her on possible prior criminal activities she had engaged in with another prosecution witness, Joe DeYoung, her former boyfriend. The prosecution objected to the proposed cross-ex-

amination on grounds of relevancy and on the basis of Evidence Code section 352, which permits the court to exclude relevant evidence if its probative value is outweighed by the danger that it will necessitate undue consumption of time or create danger of prejudice, confuse the issues, or mislead the jury. Defense counsel argued that Nola England and Joe De-Young had "a long continued activity of criminal ways, 211's [robberies], 245's [assaults]. Those are matters of public record." The theory of relevance was that, as DeYoung's confederate in crime, Nola had a hidden bias against the defendant which could not be made known to the jury unless the testimony as to prior criminal activity were admitted. The court sustained the prosecution's objections and did not allow this line of cross-examination. Nola England's counsel, present on both occasions when the subject was discussed, stated that he would instruct her not to answer questions relating to prior criminal activities on Fifth Amendment grounds.

The issue was raised and argued on two occasions. On the first, the court appears to have sustained the People's objection on grounds that the proffered evidence would be irrelevant. Defendant argues that evidence that two prosecution witnesses had been confederates in prior criminal activities would be relevant and admissible under Evidence Code section 780, subdivision (f), which allows evidence of any matter that has a tendency in reason to prove or disprove the truthfulness of a witness's testimony including the existence of a bias, interest or other motive. We agree.

However, the People also argued against the admission of this testimony on the basis of Evidence Code section 352, and, on the second occasion on which the issue was argued, the court sustained the objection on the basis that the proffered evidence, if admitted, would have been cumulative.

Evidence Code section 352 allows the trial court to exclude even relevant evidence if its probative value is outweighed by other factors. Among them is the risk that admission will necessitate undue consumption of time. Cumulative evidence is excludable on this basis. It is within the discretion of the trial court to exclude impeachment evidence as cumulative when there is already evidence of the witness's lack of credibility. (See *People* v. *Barrow* (1976) 60 Cal.App.3d 984, 994-995 [131 Cal.Rptr. 913], disapproved on another point in *People* v. *Jiminez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Fisk* (1975) 50 Cal.App.3d 364, 370 [123 Cal.Rptr. 414].)

Nola England's testimony established that she was a heroin user, was in methadone treatment at the time of the crime, and had taken about 15 Valium (10 milligrams each) the night before and the morning of the crime. The judge observed at the time of the ruling disallowing cross-examination

on the subject of prior crimes with DeYoung that Nola England had already testified that she and DeYoung had lived together as lovers for about two and a half years, that he supplied her with dope and that he sold her her gun. Thus, it was reasonable for the court to conclude that further evidence of England's lack of credibility would have been cumulative. A trial court's exercise of discretion under Evidence Code section 352 will not be reversed on appeal absent a clear showing of abuse. (*People* v. *Barrow, supra,* 60 Cal.App.3d 984, 995.) We conclude there was no abuse here.

*C. Admission of the Results of the Blood Screening Test Run on Defendant's Shoes*

Defendant argues that the trial court's failure to exclude the testimony of a state criminalist that defendant's shoes screened positive for blood was error. Because the court failed to make an explicit determination that the evidence's probative value outweighed its potential for prejudice, as required by *People* v. *Green* (1980) 27 Cal.3d 1, 23-26 [164 Cal.Rptr. 1, 609 P.2d 468], we agree. However, we conclude this error was harmless in light of the strength of other evidence properly admitted.

The prosecution called Terry Fickies, a state criminalist, who presented expert testimony that he tested the shoes defendant had been wearing at the time of his arrest and that they screened positive for the presence of blood. His testimony made clear, however, that the test could not determine whether the blood was human blood, or indeed, blood at all. Certain other enzymes could have produced positive results in such a test, including those present in cabbage and horseradish. The limitations of the test were fully explored in cross-examination. Defense counsel submitted a pretrial motion to exclude the evidence on grounds of relevance and prejudice. The court denied this motion, stating: "Prejudicial it may be if the jury believes that it is human blood. Could be prejudicial to the Defendant, but that doesn't make it inadmissible. . . . I think the evidence is relevant, and I think it's a matter of weight. It's a matter of argument to the jury. So, the motion to exclude is denied."

Defendant relies upon *People* v. *Slone* (1978) 76 Cal.App.3d 611 [143 Cal.Rptr. 61] for the proposition that a criminalist's testimony that a stain contains blood is irrelevant and therefore inadmissible if the criminalist cannot testify that the blood was human blood or how old the stain is. In *Slone,* several witnesses saw the murder victim in defendant's car on the night she was murdered. At trial, a criminalist testified that he tested the car for blood stains about a month after the murder. The test established that a stain found on the seat of defendant's automobile contained blood but the criminalist was unable to determine whether or not it was human blood

or how long it had been there. The *Slone* court held that the blood stain evidence was simply irrelevant. "In the light of logic, reason and experience, this evidence had no tendency to prove that defendant killed the victim. This evidence thus failed to meet the definition of relevant evidence set forth in Evidence Code section 210. Furthermore, if evidence is irrelevant, it must be excluded. The trial judge has no discretion to admit irrelevant evidence." (*Id.*, at p. 631.)

The situation in this case is similar. Defendant's shoes tested positive for blood, but human blood, animal blood, some vegetable enzymes and fecal material could have produced this result.[9] However, we find the reasoning in *Slone* unpersuasive. The Evidence Code definition of relevant evidence is ". . . evidence . . . having *any* tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) It is difficult to view the presence of a substance which might be blood on the seat of a car in which a murder victim was seen shortly before her death as having *no* tendency in reason to prove that the car's owner might have killed her. Similarly here, the presence of a substance which might be blood on defendant's shoes certainly has *some* tendency in reason to prove that he might have been present at the scene of a bloody shooting the night before his arrest.

■ The relevance of the evidence is not alone determinative of its admissibility, however. Defense counsel, in his motion to suppress, argued that the evidence was more prejudicial than probative. "He thereby specifically invoked the discretion vested in the court by Evidence Code section 352 to exclude relevant evidence 'if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . .'" (*People* v. *Green, supra,* 27 Cal.3d 1, 24.) "[O]n a motion invoking this ground the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . ." (*Id.*, at p. 25.) Admission of evidence "without making an explicit determination that this risk of undue prejudice did not substantially outweigh the probative value of the evidence" is error. (*Id.*, at p. 26.)

The court's statement here does not meet the *Green* standard for such an explicit determination. *Green* relied upon our cases in *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892] (in which the trial court stated that although evidence might tend to be prejudicial, "'it is material and will go in on that basis'" (*id.*, at p. 801, italics deleted)), and

---

[9]The criminalist does not appear to have been asked whether he could tell how long the "blood" had been on the shoes and did not offer this information. Defendant was arrested on October 31, 1980. The test on the shoes was not performed until about July 10, 1981.

*People* v. *Davis* (1965) 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142] (in which the trial court stated, "'Well, I viewed [the film] and I feel that while it is not pleasant to look at it is a legal exhibit and it is material for the purposes offered'" (*id.*, at p. 798, fn. 2)). As these illustrations indicate, the court's statement here that the evidence "[c]ould be prejudicial to the Defendant, but that doesn't make it inadmissible" is insufficient to meet the *Green* requirement. We therefore conclude that the admission of the evidence of the blood screening test was erroneous.

Whether this error resulted in a miscarriage of justice, a prerequisite for reversal (Cal. Const., art. VI, § 13), however, is another question. ▮ The standard of review of error not implicating constitutional rights in criminal cases is whether it is reasonably probable that a result more favorable to defendant would have occurred in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We assume for purposes of analysis that the admitted evidence was so prejudicial and of such low probative value (cf. *People* v. *Slone, supra,* 76 Cal.App.3d at pp. 631-632) that it could not have been properly admitted had the court performed the evaluation required by *Green.* ▮ Nonetheless, our cases establish that even substantial errors in a capital case will not warrant reversal if defendant's guilt is otherwise clear. (See, e.g., *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 268-269 [282 P.2d 53].) Here, although the evidence against defendant was entirely circumstantial, taken in its entirety it was convincing, even without the erroneously admitted evidence discussed here. Particularly damaging was the evidence of the 7-Eleven sack with paper currency in it found in Nola England's apartment, which is discussed *infra.* Under these circumstances, we conclude that it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of this error.

### D. Parole Search

▮ Prior to trial, defendant moved under section 1538.5 to suppress the 7-Eleven paper bag with two $5 bills which investigating officers found the evening after the killing in the course of a warrantless search of the apartment which defendant shared with Nola England. The trial court denied the motion, ruling that the search was valid as an incident to defendant's status as a parolee.[10]

---

[10]Upon his parole from prison on August 11, 1980, defendant signed a "notice and conditions of parole" which stated, "You and your residence and any property under your control may be searched without a warrant by any agent of the Department of Corrections or any law enforcement officer."

The trial court found, in support of its ruling, (1) that defendant was living with England at the apartment; (2) that defendant's parole agent had authorized the search; (3) that the parole agent's authorization was a proper exercise of his supervisory duties inasmuch as the information given to the agent by police about defendant's involvement in a crime required investigation; and (4) that the police had reasonable grounds to believe that further evidence of that crime would be found in defendant's residence. All of these findings are supported by substantial evidence. Nonetheless, defendant argues that the trial court erred in ruling that the evidence was admissible.[11]

The primary target of defendant's attack is the consent rationale articulated in *People* v. *Mason* (1971) 5 Cal.3d 759, 765-766 [97 Cal.Rptr. 302, 488 P.2d 630], and *People* v. *Icenogle* (1977) 71 Cal.App.3d 576, 583-585 [139 Cal.Rptr. 637]. In *Mason,* we upheld a warrantless police search of a probationer on the basis of search conditions which the probationer had accepted at the time probation was granted. In *Icenogle* the Court of Appeal extended that rationale to uphold warrantless searches of parolees. Defendant argues that the *Icenogle* approach to parole searches cannot survive the determinate sentencing law, which mandates parole for all prisoners who have served a determinate term. Under that law, he maintains, there is no choice, either on the part of the prisoner or upon the part of the Board of Prison Terms, as to whether parole shall occur;[12] and, without choice, there can be no voluntary consent to inclusion of a warrantless search condition among the terms of the parole.

The People do not directly address the impact of the determinate sentencing law upon the *Icenogle* rationale. Rather, they invoke the doctrine of "custodia legis" (see *People* v. *Hernandez* (1964) 229 Cal.App.2d 143 [40

---

[11]Defendant casts this argument solely in terms of the protection afforded by the Fourth Amendment. In certain contexts, we have held that article I, section 13 of our state Constitution affords defendants a broader security against searches and seizures than required by the United States Supreme Court under the Fourth Amendment of the federal Constitution. (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]; see also *People* v. *Martin* (1955) 45 Cal.2d 755, 759-761 [290 P.2d 855].) However, in the context of the parole search at issue in this case, we discern no necessity to articulate a different standard of legality under state than under federal law.

[12]The Board of Prison Terms has no discretion to grant or withhold parole to a prisoner who has served a determinate term. The prisoner neither applies for nor has the right to reject release on parole. Section 3000, subdivision (a), is a mandatory "kick-out" providing that "[a]t the expiration of a term of imprisonment . . . imposed pursuant to Section 1170, or at the expiration of such term as reduced pursuant to Section 2931 . . . the inmate shall be released on parole for a period not exceeding three years, unless the board for good cause waives parole and discharges the inmate from custody of the department." Although the board must revoke parole if the prisoner refuses to sign the parole agreement (§ 3060.5), the parolee's acceptance of parole under the determinate sentence law is in no sense pursuant to a voluntary agreement by which he has waived his right to privacy in exchange for release on parole.

Cal.Rptr. 100]; *People* v. *Howard* (1978) 79 Cal.App.3d 46, 49 [143 Cal.Rptr. 342]) and argue that because a parolee is still in "custody" he has no more rights under the Fourth Amendment than a prisoner in his cell. The argument, however, is not persuasive. Custody status in the abstract is not determinative. The United States Supreme Court held in *Hudson* v. *Palmer* (1984) 468 U.S. 517, 524-529 [82 L.Ed.2d 393, 402-404, 104 S.Ct. 3194], that a prison inmate has no reasonable expectation of privacy in his cell. In reaching that conclusion, however, the court applied a balancing of interest approach: "Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests. The two interests here are the interests of society in the security of penal institutions and the interests of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison 'shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.' [Citation.] We strike the balance in favor of institutional security, which we have noted is 'central to all other corrections goals' [citation]. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." (*Id.,* at pp. 527-528 [82 L.Ed.2d at pp. 403-404].)

The conditions which necessitate and thereby justify this total curtailment of a prisoner's Fourth Amendment rights are not present once he is free on parole. His expectation of privacy is not diminished by the surveillance which is a concomitant of confinement in prison. As one commentator has observed: "[I]n most cases the life of a parolee more nearly resembles that of an ordinary citizen than that of a prisoner. The parolee is not incarcerated; he is not subjected to a prison regimen, to the rigors of prison life and the unavoidable company of sociopaths. . . . The parolee lives among people who are free to come and go when and as they wish. Except for the conditions of parole, he is one of them." (Note (1969) 22 Stan.L.Rev. 129, 133; see also White, *The Fourth Amendment Rights of Parolees and Probationers* (1969) 31 U. Pitt. L.Rev. 167, 177.) The United States Supreme Court has itself recognized that "the liberty of a parolee . . . includes many of the core values of unqualified liberty," and that his "condition is very different from that of confinement in a prison." (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 482 [33 L.Ed.2d 484, 495, 92 S.Ct. 2593].)

Use of the balancing approach by the Supreme Court in *Hudson* v. *Palmer, supra,* 486 U.S. 517 is an implicit rejection of "custody" as the sole factor to be considered and affords a more satisfactory mode of constitu-

tional analysis than either the "consent" or "custodia legis" rationales. This court, too, used this mode of analysis in *People* v. *Mason, supra,* 5 Cal.3d 759, 764-765, in recognizing that parolees and probationers "have a reduced expectation of privacy, thereby rendering certain intrusions by governmental authorities 'reasonable' which otherwise would be invalid under traditional constitutional concepts, at least to the extent that such intrusions are necessitated by legitimate governmental demands." (See also *In re Martinez* (1970) 1 Cal.3d 641, 647, fn. 6 [83 Cal.Rptr. 382, 463 P.2d 734]; 3 La Fave, Search and Seizure, § 10.10, pp. 431-435.) What is called for once a prisoner has been released on parole is a reweighing of the balance between individual and societal interests in light of the parolee's current status in the community.

Although a parolee is no longer confined in prison his custody status is one which requires and permits supervision and surveillance under restrictions which may not be imposed on members of the public generally. The importance of these custodial restrictions is reflected in the Legislature's explanation of the mandatory parole requirement: "The Legislature finds and declares that the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge. . . ." (§ 3000.) Pursuant to this supervisory power the liberty which a felon has when paroled is conditioned on his compliance with the terms upon which he is released. The board may impose conditions it deems proper (§ 3053) and must impose statutory conditions if applicable (§ 3053.5). These conditions may govern the location in which the parolee resides, the persons with whom he associates and lives, the places to which he may travel, his use of intoxicants, and other aspects of his life. When appropriate he may be required to undergo narcotics testing, to attend outpatient mental hygiene treatment sessions, and to report periodically in person or by mail to his parole agent who may in turn visit the parolee in his home or at his place of employment. Violation of the terms of his parole may lead to revocation of parole and return to prison. (§ 3057.) Obedience to the criminal laws of the state is a condition of every parole.

"The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper imposition of conditions, the

State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 483 [33 L.Ed.2d at p. 495].) That the parole may come at the end of a term of imprisonment, rather than as part of that term, does not lessen the societal interest identified by the court.

The interest in parole supervision to ensure public safety, which justifies administrative parole revocation proceedings in lieu of criminal trial with the attendant protections accorded defendants by the Bill of Rights, also permits restrictions on parolees' liberty and privacy interests. Balancing these interests of the parolee against the societal interest in public safety leads us to conclude that warrantless searches of parolees are not per se unreasonable if conducted for a purpose properly related to parole supervision.

Petitioner contends, however, that a warrantless search condition of parole is reasonably related to parole supervision only if it would be a proper condition of probation. He thus argues that the *Bushman-Lent* criteria (*People* v. *Lent, supra,* 15 Cal.3d 481, 486; *In re Bushman* (1970) 1 Cal.3d 767, 777 [83 Cal.Rptr. 767, 83 Cal.Rptr. 375, 463 P.2d 727]) must be applied to assess the validity of such conditions. In *Lent* the court stated: "A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' [Citation.] Conversely, a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (15 Cal.3d at p. 486.)

We agree that parole conditions, like conditions of probation, must be reasonable since parolees retain constitutional protection against arbitrary and oppressive official action. (*People* v. *Thompson* (1967) 252 Cal.App.2d 76, 84 [60 Cal.Rptr. 203].) The societal interests, identified above, persuade us, however, that a warrantless search condition is a reasonable term in any parole of a convicted felon from state prison. We have never equated parole with probation in this regard. (See *In re Martinez, supra,* 1 Cal.3d 641; *People* v. *Gallegos* (1964) 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174].) The distinction between felony parole and probation justifies the inclusion of the parole search condition in all parole agreements.

A convicted defendant released on probation, as distinguished from a parolee, has satisfied the sentencing court that notwithstanding his offense

imprisonment in the state prison is not necessary to protect the public. The probationer may serve a jail term as a condition of probation (§ 1203.1), but his probation is not a period of reintegration into society during which the same degree of surveillance and supervision as that deemed necessary for prison inmates is required. A parolee cannot claim an equivalent status. The imprisonment preceding his parole has come about just because he poses a significantly greater risk to society. His offense may have been such that he was ineligible for probation initially. (See §§ 1203, 1203.06-1203.09.) The sentencing judge may have determined that the defendant posed too great a risk to the public to warrant a grant of probation. (See *People* v. *Warner* (1978) 20 Cal.3d 678, 689 [143 Cal.Rptr. 885, 574 P.2d 1237].) Or, the defendant may have been sentenced to prison following a revocation of probation occasioned by his failure to comply with conditions of probation. That he has been imprisoned at all therefore justifies inclusion of a warrantless search condition among the terms on which felony parole is established. The People were not required to establish that the condition was related to defendant's past offense. It is, per se, related to future criminality, and thus is a reasonable condition of parole.

To say that a parolee is subject to warrantless search is not to say that his privacy interest is so diminished that random searches or searches unrelated to a proper parole supervision purpose are reasonable and constitutionally permissible. The justification for exempting parole searches from the warrant requirement of the Fourth Amendment is that these searches are necessary for effective parole supervision. If a search is to have a parole supervision purpose therefore it must be based on information which leads the parole agent who conducts or authorizes the search to believe that the parolee has violated the law or another condition of his parole, or is planning to do so.[13] Were this not so, a parole search would not only invade the parolee's reasonable expectation of privacy, but would unreasonably intrude into the privacy interests of persons with whom the parolee associates or resides. Inasmuch as authority to search the residence of a parolee extends to areas which are jointly controlled with other occupants of the residence (see, e.g., *United States* v. *Matlock* (1974) 415 U.S. 164, 170-171 [39 L.Ed.2d 242, 249, 94 S.Ct. 988]; *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113]), the authority to search these premises necessarily portends a massive intrusion on the privacy interests of third persons solely because they reside with a parolee. (See, e.g., *People* v. *Palmquist* (1981) 123 Cal.App.3d 1, 13 [176 Cal.Rptr. 173], and cases cited.) A parole search must therefore be directly and

---

[13]We have no occasion in this proceeding to determine whether, or in what circumstances the background of a prisoner would justify unannounced or random searches as a special condition of parole. (Cf. *People* v. *Giminez* (1975) 14 Cal.3d 68, 73 [120 Cal.Rptr. 577, 534 P.2d 65].)

closely related to parole supervision in order to avoid unreasonable invasion of the privacy interests of the parolee and those with whom he resides.

The importance of the state's interest in public safety through parole supervision nonetheless justifies the conduct of parole searches on the basis of information which does not meet the standard of probable cause required for the issuance of a search warrant. The parole agent who authorizes the search must determine whether the information regarding a possible parole violation necessitates further investigation, and whether that investigation should include a search of the parolee and/or his residence for evidence of the suspected violation. We have long recognized that the probable cause standard need not be applied to parole searches conducted for proper parole supervision purposes. "Searches by parole officers pursuant to their duties, just as other administrative searches (see *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727]) are subject to the broad reasonableness requirement of the Fourth Amendment. [Citations.] The conditional nature of a parolee's freedom may result in some diminution of his reasonable expectation of privacy and thus may render some intrusions by parole officers 'reasonable' even when the information relied on by the parole officers does not reach the traditional level of 'probable cause.' A diminution of Fourth Amendment protection, however, can be justified only to the extent actually necessitated by the legitimate demands of the operation of the parole process." (*In re Martinez, supra,* 1 Cal.3d 641, 647, fn. 6; see also *People* v. *Mason, supra,* 5 Cal.3d 759, 764-765; *People* v. *Icenogle, supra,* 71 Cal.App.3d 576, 584-585.)

Recent decisions of the United States Supreme Court suggest no reason to change our view that the Fourth Amendment does not require application of the probable cause standard to parole searches, and that such searches are reasonable within the contemplation of the Fourth Amendment if based upon a reasonable suspicion standard. Both the Supreme Court in *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 335-337 [83 L.Ed.2d 720, 730-731, 105 S.Ct. 733], and this court in *In re William G.* (1985) 40 Cal.3d 550, 564 [221 Cal.Rptr. 118, 709 P.2d 1287], have approved that standard in the context of school administrators' searches of pupils. In *New Jersey* v. *T.L.O., supra,* 469 U.S. at p. 337 [83 L.Ed.2d at pp. 731-732], the court reiterated the balancing process we apply here for assessing the reasonableness of a search which is permissibly conducted without a warrant. "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.' (*Camara* v. *Municipal Court, supra,* at 536, 537.) On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order." After balancing

the competing interests of the schoolchild in privacy and of the administrator in maintaining order, the court concluded in *T.L.O.* that the reasonableness standard of the Fourth Amendment in this context required only a reasonable suspicion, not probable cause, to believe that the search would uncover evidence of a rule or law violation. The court's reasoning satisfies us that the Fourth Amendment does not mandate a higher standard for parole searches:

"The . . . setting . . . requires some modification of the level of suspicion of illicit activity needed to justify a search. Ordinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon 'probable cause' to believe that a violation of the law has occurred. [Citation.] However, 'probable cause' is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.' [Citation.] . . . Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." (*Id.*, at pp. 340-341 [83 L.Ed.2d at p. 734].)

Concurring in the judgment in *T.L.O.*, while expressing reservations over extension of the balancing approach beyond its traditional parameters, Justice Blackmun acknowledged the court's past use of the balancing test to approve exceptions to the probable cause requirement where a "'special law enforcement need for greater flexibility'" exists. (469 U.S. 325, 351 [83 L.Ed.2d at p. 741].) The necessity for continued supervision and surveillance of felons released from prison on parole presents such a special law enforcement purpose.

The governmental interest in the supervision of a parolee, a person convicted of a felony and sentenced to prison, certainly is not less compelling than the interest of school administrators in maintaining order in schools. ▮▮▮▮ The balance thus falls heavily on the side of the governmental interest in public safety, and leads to a conclusion that the appropriate standard of reasonableness to justify a parole search is a reasonable suspicion on the part of the parole officer that the parolee is again involved in criminal activity, or has otherwise violated his parole, and that the search may turn up evidence of that activity, or that evidence of a proposed future violation by the parolee will be uncovered. That suspicion must of course be based on articulable facts which together with rational inferences from those facts warrant objectively reasonable suspicion. (See *In re William G.*, *supra*, 40 Cal.3d 550, 564.)

██ Applying this standard we find no error on the part of the trial court in denying defendant's motion to suppress the evidence found in the residence he shared with Nora England. The search was authorized by defendant's parole agent. The information relayed by police to the agent was more than adequate to give rise to a reasonable suspicion that defendant was involved in criminal conduct and that evidence confirming that suspicion would be found in his home. An investigation was unquestionably required if effective parole supervision was to be maintained. That the search was conducted by law enforcement officers for a law enforcement purpose is irrelevant. The societal interest in parole supervision and in the speedy return of parole violators to prison in order to protect the public has added weight, not less, when a reasonable suspicion exists to believe that a parolee has been involved in criminal activity. Any violation of the law is also a violation of the conditions of a parole. The law enforcement purpose of the police who seek authorization from the parole agent for a warrantless search, and the parole supervision purpose of the agent who gives that authorization are indistinguishable. Nor is it relevant that the parolee may already be under arrest when the search is conducted. Neither the fact that the police seek the authorization, nor the fact that the parolee is already under arrest establishes that the parole agent's authorization is a "ruse," or that there is no proper parole supervision purpose for the search. A parole agent having information sufficient to give rise to a reasonable suspicion that the parolee has violated the law is required to investigate and to place a "parole hold" or detainer on the parolee to preclude his release if the charge on which he has been arrested is dismissed or bail is posted. The agent clearly has a parole supervision purpose in a search undertaken to obtain evidence of a parole violation.[14] The search was therefore reasonable within the contemplation of the Fourth Amendment.

*E. Asserted Guilt Phase Instructional Error*

██ The main thrust of defendant's argument here is the theory adopted by this court in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]: "the felony murder special circumstance of the 1978 initiative requires proof that the defendant intended to kill." (*Id.,* at p. 153.) The flaw in defendant's argument, however, is that in this case the jury made a special finding of intent to kill. Defendant challenges the validity of this finding. We do not find his arguments persuasive.

The jury was instructed that if they found the defendant guilty of murder in the first degree as charged, they were also to make a finding, as required

---

[14]To the extent that it is inconsistent with this conclusion *People* v. *Coffman* (1969) 2 Cal.App.3d 681, 688-689 [82 Cal.Rptr. 782], is disapproved.

by section 190.4, subdivision (a), as to whether the murder was committed while defendant was engaged in the commission of the crime of robbery. The jury was further instructed that, if they found that the defendant was guilty of murder in the first degree while engaged in the commission of the crime of robbery, they were also to make a finding as to whether the murder was committed with express malice aforethought and with deliberation and premeditation. Jury instructions defined "express malice aforethought" as follows: "Malice may be either express or implied. Malice is express where there is manifested an intent unlawfully to kill a human being. . . . 'Afore-thought' does not imply deliberation or lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

The jury returned a finding "that the murder of William Arias charged under count I of the amended information was committed with express malice aforethought and with deliberation and premeditation."

Defendant challenges the validity of this finding under two theories: (1) Since the Penal Code requires general verdicts in criminal cases, the judge's directive that the jury should make a special finding as to express malice was "improper." (2) The jury was not instructed that this finding had to be made unanimously nor that they had to be convinced beyond a reasonable doubt; thus, the jury may have been misled, and the finding is invalid.

We find that both of these contentions lack merit.

## 1. *The Special Finding of Express Malice*

Defendant argues that the jury instruction to make a finding as to express malice was given in violation of section 1150, which provides: "The jury must render a general verdict, except that in a superior court, when they are in doubt as to the legal effect of the facts proved, they may, except upon a trial for libel, find a special verdict."

However, the term "special finding" as used in section 190.4, subdivision (a) is not synonymous with the term "special verdict" in section 1150. Section 1152 defines a special verdict as "that by which the jury find the facts only, leaving the judgment to the Court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the Court but to draw conclusions of law upon them." Thus, a special *verdict* presents conclusions of fact and leaves to the court the task of drawing conclusions of law and rendering judgment upon them where the jury is unable to do so.

By contrast, in a capital case tried before a jury it is the jury's function to determine whether or not the charged special circumstance is true, and the special findings of section 190.4 are an adjunct of this determinative process. If the jury is unable to reach a unanimous verdict either that one of the special circumstances is true or that none of them is true, the court is directed to dismiss that jury and impanel another to try the issue of special circumstances. If the second jury is similarly unable to reach a verdict, the court may impanel a third, or try the issue itself, or effectively strike the special circumstance (by sentencing the defendant to the term for first degree murder without special circumstances). (*Ibid.*) Thus, section 190.4 does not contemplate that a jury will return the kind of special verdict provided in section 1152.

What section 190.4, subdivision (a) does require is a special *finding* "on the truth of each alleged special circumstance." The statutory language calls for a finding of the *truth* or lack of truth of each circumstance, not of the facts upon which that finding is based.

Thus, the court's instruction that the jury return a finding as to express malice in this case was proper as consistent with the requirements of section 190.4, subdivision (a), and no violation of section 1150 occurred.

■ In any case, the standard of reversible error as applied to jury instructions is whether it is reasonably probable that a result more favorable to the defendant would have occurred had the correct instruction been given. Under *Carlos,* jury instructions must make clear that a finding that the special circumstance of felony murder is true necessarily incorporates a finding that the defendant intended to kill. Had this jury been so instructed, the same verdict would have been returned albeit in a different form.

2. *Failure to Instruct on Unanimity and Beyond Reasonable Doubt*

■ Defendant argues that the court's failure to instruct the jury that the finding as to express malice had to be unanimous and proven beyond a reasonable doubt could have led the jury to believe that they did not have to be convinced unanimously beyond a reasonable doubt that these findings were true. This contention, too, is unavailing.

■ It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. (*People v. Rhodes* (1971) 21 Cal.App.3d 10, 20 [98 Cal.Rptr. 249]; *People v. Salas* (1975) 51 Cal.App.3d 151, 156 [123 Cal.Rptr. 903].) "[T]he fact that the necessary elements of a jury charge are to be found in

two instructions rather than in one instruction does not, in itself, make the charge prejudicial." (*Rhodes,* at p. 20.) "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." (*People* v. *Galloway* (1979) 100 Cal.App.3d 551, 567-568 [160 Cal.Rptr. 914].)

In this case, the jury was instructed: "You are not to single out any certain sentence or any individual point or instruction and ignore the others. You are to consider all the instructions as a whole and are to regard each in the light of all the others." The jury was instructed that they had to agree unanimously as to defendant's guilt and as to the degree of murder. They were told they had to agree unanimously "[i]n order to find the special circumstance charged in this case to be true or untrue . . . ." They were also instructed: "Both the People and the defendant are entitled to the individual opinion of each juror. It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict, if you can do so. Each of you must decide the case for yourself but should do so only after a discussion of the evidence and instructions with the other jurors. You should not hesitate to change an opinion if you are convinced it is erroneous; however, you should not be influenced to decide any question in a particular way because a majority of the jurors or any of them favor such a decision." And: "In order to reach a verdict, all 12 jurors must agree to the decision and *to any finding you have been instructed to include* in your verdict." (Italics added.)

When the verdicts were returned, each juror was polled as to each verdict and each finding. The judge commented (in response to a request initiated by defendant that the polling of the jury be waived): "I know it's a strain, but I think in all fairness to counsel it should definitely show that these verdicts were unanimous, Mr. Burgener." When asked, "Is this your finding?" with reference to the finding that the murder was committed with express malice aforethought and with deliberation and premeditation, each juror replied, "Yes." Under these circumstances, there can be no doubt that the finding was unanimous.

The jury was instructed: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt." They were also instructed that the reasonable doubt standard applied specifically to proof of murder and degree of murder, to the special circumstance, to the intent to inflict great bodily injury, and to use of a firearm. The only time any other standard of proof was mentioned to the jury was when they were told that to establish the

defense of entrapment, "the defendant has the burden of proving by a preponderance of the evidence that the conduct of the law enforcement agents or officers or persons acting under their direction, suggestion, or control was such as would likely induce a normally law-abiding person to commit the crime."

Given the entirety of the charge to the jury, it is clear that there is no reasonable possibility that the jury could have been misled as to the appropriate standard for their special finding on express malice. The instructions taken as a whole indicate that the prosecution's burden of proof throughout was proof beyond a reasonable doubt.

Defendant refers us to the case of *People* v. *Salas* (1976) 58 Cal.App.3d 460 [129 Cal.Rptr. 871], in which the court found prejudicial error in the giving of a circumstantial evidence instruction with respect to one specific intent determination but in not also giving the instruction with regard to another specific intent requirement. The defendant in *Salas* was convicted of robbery (which requires specific intent to permanently deprive) with the specific intent to inflict great bodily injury on the victim. The court concluded that giving the circumstantial evidence instruction with respect to proof of specific intent for the crime of robbery itself, without giving the same instruction with respect to the specific intent to inflict great bodily injury might have misled the jury as to the manner in which they should evaluate the circumstantial evidence of intent in the latter instance.

No such conclusion is possible here. The fact that the court did not specifically state that the jury's finding of express malice must meet the beyond-a-reasonable-doubt standard does not indicate that the jury could have been misled into thinking it should apply some other standard with reference to this finding. All of the instructions given indicated that the prosecution had to prove its case beyond a reasonable doubt. The fact that this was not explicitly reiterated in the instructions on the special finding of express malice does not suggest that the jury could have concluded that some other standard might apply. We conclude that defendant's challenge to the jury's finding of express malice aforethought lacks merit.

Since defendant was convicted of felony murder with an intent to kill, his challenges to the felony-murder rule itself are refuted in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].

## IV.

### PENALTY PHASE

Defendant did not participate in the penalty phase of his trial, and defense counsel presented no mitigating evidence or argument on his behalf

during this stage of the proceeding. Defense counsel made clear to the court, in a discussion held in chambers, that he had proposed to call in mitigation a psychiatrist, the defendant's parents, and a person who served in prison at the same time as defendant, but that defendant had instructed him not to do so. Defendant personally confirmed these instructions.

The People then presented evidence of incidents of defendant's violent behavior during prior periods of incarceration as well as evidence of prior felony convictions for such charges as battery, robbery, and attempted murder. Defense counsel, acting on direction of his client, stipulated to the evidence. The prosecutor, in his argument to the jury, referred to the aggravating and mitigating factors identified in Penal Code section 190.3, and stated: "The Judge will instruct you that as you view these factors if the aggravating circumstances outweigh the mitigating circumstances you shall impose the death penalty." He then reviewed the statutory factors in light of the evidence, arguing essentially that there were no factors in mitigation.

At the conclusion of the prosecutor's argument, defense counsel read to the jury a statement attributed to his client. The statement read, in part: "I have to be the only expert in these proceedings on which it is like to serve time in a penitentiary. Certainly, I am the only expert on the value of life, especially my life. It is because I am the only person who is an expert in these two areas that I ask you to return a sentence of death."

The court then proceeded to instruct in accordance with the language of section 190.3 as to the various factors in aggravation and mitigation. The jury was not told that it could consider as a mitigating factor "'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,'" or "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) In accordance with the prosecution's prediction the jury was told, in the literal words of section 190.3: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances you shall impose a sentence of death." The jury was given no further explanation of its sentencing responsibilities, and it returned a sentence of death.

In *People* v. *Deere, supra, ante,* page 353, we recently held that the failure of defense counsel to present any mitigating evidence in the penalty phase of a capital trial, in obedience to his client's request, required that the penalty be set aside. We emphasized the state's interest in a reliable penalty determination, and observed: "To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from

the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling." (*Id.*, at p. 364.) And, we concluded: "We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal. Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all." (*Id.*, at p. 368.)

In *People* v. *Brown, supra,* 40 Cal.3d 512, we construed section 190.3's provision that the jury "*shall* impose a sentence of death" (italics added) if it finds that relevant "aggravating" circumstances "outweigh" those in mitigation. We concluded that the Constitution forbids any capital penalty scheme which forces the sentencer "to impose death on any other basis than [its] own judgment that such a verdict [is] appropriate under all the facts and circumstances of the individual case. [Fn. omitted.]" (P. 541.) However, we declined to interpret section 190.3's language as establishing such an invalid mandatory sentencing formula. (*Ibid.*)

We did recognize in *Brown* that penalty instructions phrased in the literal language of section 190.3, given without further explanation, could lead a capital sentencing jury to believe incorrectly that it *must* return a death judgment in certain circumstances after a strict and mechanical "weighing" of "aggravating" against "mitigating" evidence. (P. 545, fn. 17.) To avoid such confusion, we admonished trial courts in future penalty trials under the 1978 law to further instruct the jury in accordance with the principles set forth in *Brown.* We stated that prior 1978-law cases in which such explanations had not been given would be examined individually to determine, in context, whether the sentencer might have been misled to defendant's prejudice about the scope of its discretion and responsibility. (*Ibid.*)

The fact that defense counsel deliberately refrained from introducing any evidence in support of a lesser penalty than death, though such evidence was available, in itself requires penalty reversal under *Deere.* Moreover, as a result of this conduct there existed a vacuum—the total absence of mitigating evidence in the penalty phase—which, in the context of the instructions and argument to the jury made it almost certain that the jury would misinterpret its role. The jury was not told it could consider character and background evidence it deemed mitigating, and it was never informed, either by court or by counsel, that it had sole discretion to determine the appropriate penalty for defendant under all the relevant circumstances. Indeed, the prosecutor's explanation of the sentencing scheme reinforced the supposition that the law limited the jury to a mechanical comparison of "aggravating" against "mitigating" circumstances, while emphasizing the complete absence of the latter. Under these circumstances, the court's un-

amplified instruction that the jury "shall" impose death if aggravating circumstances "outweigh[ed]" mitigating amounted to a directed verdict of death.

Defense counsel and his client "threw in the towel" at the penalty phase, inviting the jury to impose the death penalty. In addition, the jury was in effect told that it must impose the death penalty under the circumstances. For both these related reasons we conclude that the death penalty must be set aside.

V.

CONCLUSION

The judgment as to guilt, and the finding of a special circumstance, are affirmed. The penalty judgment is reversed.

Reynoso, J., and Wallin (Edward J.), J.,* concurred.

MOSK, J.— I concur generally in the analysis of the majority. I quarrel only with the encouragement given for the filing of a petition for habeas corpus on the subject of alleged jury misconduct.

Inquiry into a juror's conduct that took place five years ago is not practical. The problems of finding the jurors who participated in that trial, bringing them to court, and interrogating them about the detailed conduct and conversations that took place in the jury room, appear to me to be insurmountable.

Rather than to temporize by suggesting a passing of the buck to another court for another proceeding, I would prefer to determine the issue with finality here where the buck stops.

After the foreman of the jury called the court's attention to the purported questionable conduct of one juror, the court might have pursued the matter further. The complaint was brought to the attention of both counsel; but even if neither indicated a desire to take further action, the court could have done so sua sponte.

Nevertheless there are factors which convince me there was no error in the court's failure to pursue the matter. The foreman reported the allegedly

---

*Associate Justice, Court of Appeal, Fourth District, Division Three, assigned by the Chairperson of the Judicial Council.

offending juror's conduct at 3:15 on Monday afternoon. At 4:10 that afternoon the jurors were excused for the night, and given a stern admonition by the judge regarding the use of intoxicants. Deliberations were resumed at 9 o'clock Tuesday morning. During the morning the jury asked for additional instructions; at that time no untoward conduct of the juror was evident or reported by the foreman. Not until later that morning did the jury return a verdict. Upon being polled, all the jurors recited orally that this was their verdict; again the alleged offender did not misbehave in any way, or give any objective indication of intoxication.

In many respects this situation is comparable to that in *People* v. *Crooker* (1956) 47 Cal.2d 348, 356 [303 P.2d 753], affirmed 357 U.S. 433 [2 L.Ed.2d 1448, 78 S.Ct. 1287]. In *Crooker,* also a capital case, after deliberations were underway, 10 of the 12 jurors drank an intoxicant with their dinner on December 8, and one juror had a "double" cocktail. The verdict was not reached until December 9. This court found no error, despite cases of a century ago, such as *People* v. *Lee Chuck* (1889) 78 Cal. 317 [20 P. 719], that required reversal if jurors consumed any quantity of alcohol. Said the *Crooker* court: "It is a matter of common knowledge that the effect of the quantity of alcohol consumed in the instant case, followed by a large meal, a night's sleep and breakfast, would have been entirely dissipated and could have had no influence upon the mental operations of the jury." (See also *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 412 [185 Cal.Rptr. 654, 650 P.2d 1171]; *People* v. *Van Horn* (1897) 119 Cal. 323, 333 [51 P. 538].)

Here, like *Crooker,* even if the alleged offender had in fact taken intoxicants on Monday, the verdict was not reached until after dinner, a night's sleep, breakfast on Tuesday, additional instructions in court and further deliberations that morning. Any effect of intoxicants would clearly have been dissipated long before the verdict was reached.

I see no need for further proceedings in another court, but with finality would affirm the judgment of guilt. I concur in the balance of the majority opinion.

**BROUSSARD, J.—** ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆
▆▆▆ I concur in the majority opinion. Defendant did not receive a fair and balanced penalty trial in which mitigating as well as aggravating evidence was presented. (See *People* v. *Deere* (1985) 41 Cal.3d 353, 368 [222 Cal.Rptr. 13, 710 P.2d 925] (conc. opn. of Broussard, J.).)

**BIRD, C. J.,** Concurring and Dissenting.—I cannot agree that in a capital case the guilt and special circumstance verdicts can be upheld where there

is evidence that one of the jurors was intoxicated during deliberations. No fewer than five jurors expressed concern that Juror M. was intoxicated during deliberations.

The record provides ample support for the conclusion that the trial court committed reversible error by failing to conduct a thorough inquiry into the juror misconduct here. It is, therefore, inappropriate to saddle appellant, who bears no responsibility for the trial court's failings, with the burden of reassembling his jury panel and demonstrating anew, to another court on habeas corpus, the prejudicial effect of the trial court's error.

## I.

The majority correctly hold that the trial court was remiss in its duty to conduct, sua sponte, an inquiry into Juror M.'s ability to continue as a member of the panel. (Majority opn., *ante,* at pp. 518-521.) However, the majority find this omission insufficient to warrant reversal because they believe the record does not "establish that juror M. had actually used intoxicants or that her ability to deliberate was affected by them." (*Id.,* at p. 521.)

The majority's conclusion rests on their claim that the record contains only "the foreman's unsupported assertion" that Juror M. appeared intoxicated, supplemented with hearsay evidence "that four other jurors had expressed concern" along these lines. (Majority opn., *ante,* at p. 521.) Added to this supposed evidentiary lapse is defense counsel's "preference that the court conduct no inquiry." (*Id.,* at p. 521.) The net effect of these considerations prompts my colleagues to affirm the conviction and special circumstance finding and to relegate appellant to raising the claim of jury misconduct in a habeas corpus proceeding "at which [he] would be able to produce evidence of Juror M.'s condition and behavior." (*Id.,* at p. 522.)

As a preliminary matter, I cannot join in the majority's unfortunate suggestion that defense counsel's acquiescence in and encouragement of the trial court's decision to forego questioning of the jurors frustrated a full and fair inquiry by the trial court. (*Id.,* at p. 521.) However tactically appropriate counsel's motives might have been, they could not operate as a waiver of appellant's personal right to a properly constituted and unanimously deliberating panel of jurors. That right was compromised when the trial court failed to conduct a full inquiry into the matter.

Errors which substantially affect the constitutional right of jury trial are not subject to waiver by a failure to object and may not be cured by consent of the accused's attorney. (See generally, Witkin, Cal. Criminal Procedure (1963) § 764, pp. 736-737; *People v. Bruneman* (1935) 4 Cal.App.2d 75

[40 P.2d 891]; *People* v. *Garcia* (1929) 98 Cal.App. 702, 704 [277 P. 747].) For example, the constitutional guaranty has been interpreted to render ineffective counsel's stipulation to a verdict by 11 jurors after 1 juror has been discharged for good cause. (*People* v. *Ames* (1975) 52 Cal.App.3d 389 [124 Cal.Rptr. 894]; *People* v. *Maes* (1965) 236 Cal.App.2d 147 [45 Cal.Rptr. 903].)

If counsel's acquiescence in the trial court's failure to conduct an appropriate inquiry was tantamount to consenting to an eventual verdict from only 11 competent jurors, such consent was not binding on appellant. A reversal would be required on the ground that appellant's right to a unanimous jury verdict was violated.

However, one need not engage in such supposition to identify the reversible error in this case. *People* v. *McNeal* (1979) 90 Cal.App.3d 830 [153 Cal.Rptr. 706], provides ample reason why the trial court's failure to conduct a timely inquiry into the alleged juror misconduct was prejudicial error.

In *McNeal,* the trial court failed to inquire fully into whether there was good cause to excuse a juror. During deliberations, the juror had revealed her realization, arrived at after hearing a defense witness, that she had personal knowledge about the case. When the matter was brought to the trial judge's attention, he questioned the foreperson and the juror, but preceded each question session with a caveat that he did not want to "go into factual matters." (90 Cal.App.3d at p. 836.) Ultimately, the judge decided to retain the juror on the panel and instructed the jury to resume deliberations. (*Ibid.*)

The Court of Appeal held that the failure to conduct a more thorough inquiry violated the accused's constitutional right to a fair and impartial jury. (Cal. Const., art. I, § 16.) Like the majority here, *the court specifically acknowledged the possibility that no misconduct may have occurred* and distinguished other cases where "misconduct could be determined from the facts." (*McNeal, supra,* 90 Cal.App.3d at pp. 839-840.) "Here, further inquiry might have demonstrated that there was misconduct, or although there was no misconduct, the juror should be discharged because of her personal knowledge, *or that there was no misconduct, personal knowledge, or other good cause for discharging the juror.*" (*Id.,* at p. 840, italics added.)

However, in marked contrast to the disposition here, and in the face of the availability of a postappeal habeas corpus proceeding, the court reversed the judgment of conviction. "[W]here the fact of a sworn juror's impartiality comes into question as a result of that juror's conduct or statements

during the course of the trial or the deliberations, the failure of the court to make at least a preliminary inquiry into the facts of such impartiality cannot be said to be error harmless beyond a reasonable doubt." (*Ibid.*) My colleagues' wholehearted adherence to *McNeal*'s duty-of-inquiry rule, with their rejection of its reasoning and ultimate holding, is somewhat puzzling.

One line of cases following this court's decision in *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] provides further support for the proposition that the trial court's failure to inquire into Juror M.'s condition requires a reversal of the guilt and special circumstance verdicts.

*Marsden* holds that when an accused moves for a substitution of appointed counsel, the court must provide him with an opportunity to explain the reasons underlying that motion. Failure to do so constitutes reversible error. (*Id.*, at p. 126; accord *People* v. *Lewis* (1978) 20 Cal.3d 496 [143 Cal.Rptr. 138, 573 P.2d 40].)

Several Court of Appeal cases have, following *Marsden*'s reasoning, required trial courts not only to afford the accused an opportunity to explain the specific instances of the attorney's alleged inadequacies, but also to affirmatively inquire on the record into the bases of the accused's complaints. (*People* v. *Hill* (1983) 148 Cal.App.3d 744, 753 [196 Cal.Rptr. 382]; *People* v. *Cruz* (1978) 83 Cal.App.3d 308, 316-319 [147 Cal.Rptr. 740]; *People* v. *Molina* (1977) 74 Cal.App.3d 544, 548 [141 Cal.Rptr. 533]; *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66 [115 Cal.Rptr. 726]; *People* v. *Groce* (1971) 18 Cal.App.3d 292, 296-297 [95 Cal.Rptr. 688]; see *People* v. *Green* (1971) 15 Cal.App.3d 524, 527 [93 Cal.Rptr. 84].)[1] Many of these decisions have reversed the appellant's conviction upon finding that the trial court's inquiry was less than adequate. (*People* v. *Hill, supra,* 148 Cal.App.3d at pp. 755-756; *People* v. *Cruz, supra,* 83 Cal.App.3d at pp. 318-319, 334; *People* v. *Munoz, supra,* 41 Cal.App.3d at p. 67; *People* v. *Groce, supra,* 18 Cal.App.3d at p. 297.)

---

[1] As explained in *People* v. *Munoz, supra,* 41 Cal.App.3d at page 66: "[T]he mandate of [*Marsden*] is not limited necessarily to a case where the trial judge refuses to give the defendant the opportunity to be heard . . . . [T]he *ratio decidendi* of the high court's opinion tells us that the judge's obligation to listen to an indigent defendant's reasons for claiming inadequate representation by court-appointed counsel is not a pro forma function. It tells us also that under some circumstances a court's ruling denying the request for a substitution of attorneys without a careful inquiry into the defendant's reasons for requesting the substitution 'is lacking in all the attributes of a judicial determination.' [Citations.]" This duty-of-inquiry includes "an inquiry into the state of mind of the court-appointed attorney" and an attempt "to ascertain in what particulars the attorney was not providing appellant with a competent defense." (*Ibid.*) *Munoz* has been cited with approval by this court in *People* v. *Lewis, supra,* 20 Cal.3d at page 499.

Noting the fundamental nature of the right to counsel which the duty-of-inquiry rule seeks to protect, these courts have emphasized the fact that the trial court's failure to conduct an adequate inquiry rendered intelligent appellate review of the denial of the substitution motion impossible. The courts have frankly acknowledged that the record was less than complete as to counsel's alleged inadequacies. (See, e.g., *People* v. *Groce, supra,* 18 Cal.App.3d at p. 297.) However, each of these courts has refused to speculate as to the nature of the inadequacies and has not required the question to be litigated in collateral proceedings.[2] This reasoning is entirely appropriate in the present case.

Additionally, several practical considerations severely undermine the wisdom of requiring appellant to relitigate this matter on habeas corpus. For example, it is highly unlikely that an examination of Juror M.—assuming she can be found at this late date—will produce anything more than a staunch denial as to whether she had consumed intoxicating substances during the period of deliberations.

Here, as in all criminal cases, Juror M. no doubt took an oath to "well and truly try the matter in issue . . . and a true verdict render according to the evidence." (Code Civ. Proc., § 604; Pen. Code, § 1046; see Keene & George, Cal. Superior Court Criminal Trial Judge's Benchbook (1984) p. 243.) Like her colleagues, she was instructed that "[b]oth the People and the defendant have a right to expect that [she would] conscientiously consider and weigh the evidence and apply the law of the case . . . ." (CALJIC No. 1.00 (1979 Rev.).) She was admonished that her "attitude and conduct . . . at the beginning of . . . deliberations are matters of considerable importance." (CALJIC No. 17.41.) And, she was told to "decide the case for [herself], but . . . only after a discussion of the evidence and instructions with the other jurors." (CALJIC No. 17.40.)

What juror would, in disobedience to these solemn admonitions, admit to drinking alcohol and smoking marijuana during deliberations? Just as "the bias of a juror will rarely be admitted by the juror himself,"[3] violations of a juror's oath and acts in derogation of a court's clear instructions will not be easily confessed to in proceedings conducted long after the fact. (See *McIlwain* v. *United States* (1983) 464 U.S. 972 [78 L.Ed.2d 349, 104 S.Ct. 409] (dis. opn. of Marshall, J. to den. of cert.).)

---

[2]*Groce* is particularly instructive on this point. The dissent criticized the majority for reversing the conviction without a showing that had counsel not committed the asserted error counsel's inadequacies were in fact prejudicial to the appellant. (*Id.,* at pp. 297-298 (dis. opn.).)

[3]*McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548, 558 [78 L.Ed.2d 663, 672, 104 S.Ct. 845] (conc. opn. of Brennan, J.). See also *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 938-939 [200 Cal.Rptr. 77].

Other problems with the habeas corpus solution are readily apparent. What if Juror M. can be located to testify as to her condition during deliberations, but none of the other jurors who observed her? What if the foreperson, Mrs. Olds, who first brought the matter to the judge's attention, cannot be located to reaffirm her observations, or none of the other jurors who independently corroborated her account, can be found? Is the trial court to determine the matter without all of the percipient witnesses to the misconduct? In short, if reversible error were committed at the guilt and special circumstances trial, why should the trial court's failings, for which appellant cannot be held responsible, deprive him of an opportunity to seek the best result which the circumstances permit?

More fundamentally, requiring appellant to resolve the question of prejudice in a habeas corpus proceeding at this late date may unfairly require superhuman recall powers of even the most diligent juror. Assuming the members of the panel in appellant's case can be located and reassembled, they will be called upon to remember with crystal clarity, over four years after the fact, the behavior and demeanor of one of their colleagues. (Cf. *In re Finley* (1968) 68 Cal.2d 389, 393 [66 Cal.Rptr. 733, 438 P.2d 381] [holding that it is inappropriate to determine whether an accused's foreign conviction satisfies the enhanced punishment requirements of the habitual criminal statute (former Pen. Code, § 644, subd. (a)) "on the basis of the testimony of witnesses who may have died or disappeared *or whose memories have faded.*" (Italics added.)].) Neither logic nor good sense dictates such a procedure, especially when appellant's eligibility for capital punishment hangs in the balance.

It is also unclear how much additional admissible evidence of the event will be introduced in a habeas corpus proceeding. Certainly one formidable obstacle is Evidence Code section 1150. Subdivision (a) of that statute provides that "[u]pon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

As is well established, "'[a] juryman may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind.'" (*People* v. *Stokes* (1894) 103 Cal. 193, 197 [37 P. 207].) "The law, in its wisdom, does not allow a juror to purge himself in that way." (*Ibid.*) Thus, under Evidence Code section 1150, "proof of overt acts, objectively ascer-

tainable" is permitted, while "proof of the subjective reasoning processes of the individual juror" is not. (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) "Because the latter can be neither corroborated nor disproved, they are excluded." (*People* v. *Adame* (1973) 36 Cal.App.3d 402, 408, fn. 5 [111 Cal.Rptr. 462].)

Certainly objective evidence of Juror M.'s state during the deliberations will be admissible on the question of her competency to perform her duties. However, no evidence will be permitted as to whether her condition, intoxicated or not, affected her ability to deliberate along with her colleagues, since such evidence would involve proof of her "subjective reasoning processes" prohibited by Evidence Code section 1150. For this reason, it is unlikely that a habeas corpus proceeding will uncover significant facts other than those already in this assertedly "insufficient" appellate record.

On the record before this court, a reversal is compelled. No fewer than five jurors expressed concerns that Juror M. had been intoxicated during deliberations. Three of these jurors indicated to foreperson Olds that they had smelled marijuana on her breath. Unlike the majority, I am unwilling to dismiss these expressions of concern as "hearsay of limited probative value" (majority opn., *ante,* at p. 521), since they cast severe doubts on Juror M.'s ability to deliberate. Those doubts are substantial enough to render the guilt and special circumstance verdicts suspect.[4] To affirm those verdicts and thereby permit appellant to be eligible for the death penalty is to invite violation of the reliability principle that this court and the United States Supreme Court have invoked in capital cases. (See *People* v. *Chadd* (1981) 28 Cal.3d 739, 751 [170 Cal.Rptr. 798, 621 P.2d 837]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989, 98 S.Ct. 2954].) For that reason, I cannot agree.

## II.

The importance of unanimous juror participation in the deliberative process cannot be overemphasized. Chief Justice Wright aptly expressed this idea a decade ago in *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. As he observed, "[t]he requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus *through deliberations which are the common experience of all of them. . . .*

---

[4] These suspicions were in no way cured by the trial court's admonition to the panel not to consume any intoxicants which "might interfere with [the jurors'] hours [*sic*] of concentration, their reasoning abilities . . . ." By the time the court gave that cautionary instruction, the jurors had already deliberated some 12 hours, over 75 percent of the total deliberations period. (See *People* v. *Hogan* (1982) 31 Cal.3d 815, 847 [183 Cal.Rptr. 817, 647 P.2d 93] (lead opn. of Bird, C. J.).)

Deliberations provide the jury with the opportunity to review the evidence *in light of the perception and memory of each member.* Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. . . . The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument *and who together have deliberated to unanimity."* (*Id.,* at p. 693, italics added.)

In addition, ensuring the sanctity of deliberations and the competency of those who engage in them is, particularly in a capital case, fundamental to the constitutional right of trial by jury. "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiassed [*sic*] judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." (*Mattox* v. *United States* (1892) 146 U.S. 140, 149 [36 L.Ed. 917, 921, 13 S.Ct. 50]; see *People* v. *Hogan, supra,* 31 Cal.3d at p. 848 (lead opn. of Bird, C. J.).) As Justice Marshall recently observed, the "precious right" of trial by jury "is denigrated when a conviction resting upon deliberations tainted by a juror's gross and debilitating impropriety is allowed to stand." (*McIlwain* v. *United States, supra,* 464 U.S. at p. 975 [78 L.Ed.2d at p. 350] (dis. opn. of Marshall, J. to den. of cert.).)

These observations are a fitting reminder that this court cannot uphold a jury verdict where the unanimity of deliberations and the competency of a juror have been rendered suspect by evidence that the juror was intoxicated. Since the trial court failed to conduct an inquiry into Juror M.'s conduct at a time when that inquiry would have resolved any doubts as to her condition, a reversal of the guilt and special circumstance verdicts is required.

### III.

There is one additional point—not discussed by the parties—which raises a question in my mind as to the validity of the felony-murder special circumstance finding. I briefly note the source of my concern.

As the majority point out (*ante,* p. 536-537), the jury in this case returned a "special verdict" indicating that the murder was committed with express malice aforethought and with deliberation and premeditation. If the jury had been informed that these factors—express malice, premeditation and deliberation—were necessary prerequisites to a determination that the felony-murder special circumstance was true, and if defendant was aware from the

outset that the jury was to be so instructed, the special verdict would obviously eliminate any issue under *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

One potential problem, however, is that the jury in this case was not instructed that any one of these additional factors—express malice, premeditation or deliberation—was a required element of the special circumstance finding. Instead, the court simply told the jury that if it found the special circumstance to be true—applying the erroneous pre-*Carlos* standard—it should then make an additional and separate finding with respect to express malice, etc.[5] The court never informed the jury that if it found that express malice had not been established, it should vacate or alter its special circumstance finding. Thus, the jury apparently never knew the significance of its special "express malice" finding or for what purpose it was being asked to make such a finding.

A further problem is raised by the fact that—at least as far as I have been able to discover—the record does not make it clear when defendant first

---

[5]In instructing the jury on the elements of the special circumstance, the court stated: "To find that special circumstance, referred to in these instructions as murder in the commission of a robbery, is true, it must be proved that the murder was committed while the defendant was engaged in the commission of a robbery or that the murder was committed during the immediate flight after the commission of a robbery by the defendant and that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection."

Thereafter, in explaining the verdict forms that the jury was being given, the court stated: "You are instructed that if you find the defendant guilty of murder of the first degree as charged under Count 1 of the Amended Information, then you shall also make a finding in one of the following forms as to whether the murder was committed while the defendant was engaged in the commission of the crime of robbery in violation of Section 211 of the Penal Code, and the finding would be one of the following: [¶] We the jury in the above-entitled action find that the murder of William Arias charged under Count 1 of the Amended Information was committed while the defendant was engaged in the commission of a robbery in violation of Section 211 as alleged in the allegation of special circumstance, or; [¶] We the jury in the above-entitled action find that the murder of William Arias charged under Count 1 of the Amended Information was committed while the defendant was not engaged in the commission of a robbery.

"You are instructed that if you find the defendant Michael Ray Burgener guilty of murder in the first degree committed while engaged in the commission of the crime of robbery within the meaning of Penal Code . . . Section 190.2(a)(17)(i), then you shall also make a finding in one of the following forms as to whether the murder was committed with express malice aforethought and with deliberation and premeditation: [¶] We the jury in the above-entitled action find the murder of William Arias, charged under Count 1 of the Amended Information, was committed with express malice aforethought and with deliberation and premeditation, or; [¶] We the jury in the above-entitled action find that the murder of William Arias charged under Count 1 of the Amended Information was not committed with express malice aforethought and with deliberation and premeditation.

"And those two findings will be submitted to you in the form of special verdict forms."

The jury thereafter returned two separate verdicts, one finding that defendant had committed the murder during the commission of a robbery as alleged in the special circumstance allegation, and the other finding that the murder was committed with express malice aforethought and with deliberation and premeditation.

learned that the trial court was going to elicit this special verdict from the jury. The record does indicate that, in the middle of the presentation of the defense case, the prosecution submitted the instruction for a special finding on express malice, etc., which the trial court eventually gave.

However, I cannot tell what precipitated this submission by the prosecution or whether appellant had sufficient notice of the trial court's decision to elicit this finding to permit him to present his defense with this matter in mind. If appellant formulated and presented his defense with the understanding that intent to kill was irrelevant to the special circumstance finding and his eligibility for the death penalty, I do not believe that the fact that the trial court belatedly decided to obtain an additional "special finding" on express malice would necessarily cure the *Carlos* problem.

As noted at the outset, the parties have not raised or discussed these questions in their briefs. It may well be that there is material in or outside the record of which I am unaware which demonstrates that my uneasiness on these points is unwarranted.

Appellant's petition for a rehearing was denied May 22, 1986.