Filed 8/18/21  P. v. Gibson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>FREDDY JAMES GIBSON,<br><br>       Defendant and Appellant. | C088450<br><br>(Super. Ct. No. 17FE022101) |

A jury found that defendant Freddy James Gibson attempted to murder a maintenance man at his apartment complex by shooting him multiple times with a firearm and beating him.  Defendant appeals, arguing the trial court erred by excluding video clips of defendant making several bizarre comments shortly after the attempted murder, which defendant contends were relevant as to whether he acted with the requisite intent.  Defendant further argues the trial court erroneously included the firearm enhancement under Penal Code section 12022.53, subdivision (d) when it calculated

1

defendant's minimum sentence under the Three Strikes law (statutory section references that follow are to the Penal Code). We find no merit to defendant's contentions and affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

The Attempted Murder

Defendant lived in an apartment complex with his girlfriend and her son, Deveon. The apartment's maintenance man, Carlos, saw defendant and Deveon nearly every morning. They occasionally interacted and their conversations were always friendly. However, Carlos eventually observed a change in defendant's demeanor. Defendant seemed angry or upset on a couple of occasions and said things that did not make sense to Carlos.

One afternoon, defendant and Deveon entered the apartment that Carlos was painting. Carlos turned around, and defendant said, "You know, you know," and "something about a contract." Carlos did not know what defendant was talking about. Defendant had a crazy look in his eyes. Carlos noticed Deveon slowly attempt to close the front door, but Carlos's items on the floor prevented the door from shutting. Defendant pulled out a piece of paper and repeated, "You know" and "something about a contract." He accused Carlos of raping and beating him in prison in the 1980's, as the leader of a gang. Carlos, who had never been to prison and never been involved in a rape, did not know what defendant was talking about.

Defendant grew agitated and angry. Carlos knew something was wrong because this was not like their usual friendly encounters. As Deveon stood near the door, defendant pulled out an "old-looking" revolver and pointed it at Carlos's face from approximately two feet away. Defendant demanded Carlos get on his knees. Carlos refused, and defendant pulled the trigger. Carlos heard a "click," but the gun either

2

misfired or was not loaded at the time. Carlos shoved his painting cart into defendant and ran out the front door.

As Carlos fled, defendant chased after him. Carlos heard two gunshots and felt two hits in the back of his head. Carlos yelled, "This guy got a gun[!]" He heard a third gunshot and felt a hit on the back of his left shoulder. Carlos felt a ripping pain from his shoulder to his upper spine and neck. As he kept running, he felt defendant pounding on his head with the butt of his gun, approximately 15 to 20 times. While defendant pounded on Carlos's head, Carlos reached the leasing office and the manager opened the door, separated defendant from Carlos, and helped Carlos inside the office. The assistant manager grabbed a baseball bat and called 9-1-1.

Gun in hand, defendant banged on the leasing office door for about 30 seconds. He then left with Deveon and returned shortly thereafter with a sawed-off shotgun wrapped in a blanket. He again banged on the door and windows, looked in the window, and yelled, "Bring him out here, bring him out here[!]" Defendant turned and walked towards two workmen, who were standing nearby and had witnessed defendant holding a gun while chasing a bloody man. Still holding the shotgun, defendant asked one of them in a serious tone, "Do you know who I am?" The workman replied, "No." By then, the police had arrived. They detained defendant, who asked them multiple times if they knew who he was. The police recovered the revolver and sawed-off shotgun and found that both were loaded.

### The Trial Court's Exclusion of Video Evidence

A psychologist initially evaluated defendant's mental health and determined he was not competent to stand trial. The psychologist specifically found that defendant was experiencing symptoms of psychosis and harbored delusional beliefs that "impair[ed] his ability to discuss his case in a rational manner as well as his ability to choose a defense strategy as he fears if he goes to trial he will be killed." The psychologist concluded it

3

was "most likely that [defendant's] symptoms [were] induced or exacerbated by methamphetamine use, but his symptoms may meet criteria for schizophrenia." Several months later, the psychologist reevaluated defendant and found he was competent to stand trial. He concluded that defendant "no longer has symptoms of a major mental illness" and that the psychotic symptoms he observed in his previous interview "were very likely methamphetamine-induced and are now in remission."

During the trial, defendant sought to admit multiple short video clips from the approximately three-hour long dash cam video taken of defendant when he was first detained. He specifically asked to introduce defendant's statements that he needed to talk to Darryl Hahn or Darryl "Steinburger [*sic*]" and see the Governor, and that the gang who raped him in prison, including Carlos, took $30-$50 million from him. Defendant argued that his odd statements and conduct in the video clips evidenced a mental disorder or defect relevant to whether he harbored the requisite specific intent to commit premeditated attempted murder, or to support the sentencing enhancement allegation that he acted willfully, deliberately, or with premeditation. However, defendant declined to offer an expert to testify on defendant's mental health. The People opposed defendant's motion, arguing the video clips constituted hearsay and lacked foundation.

Following briefing, two oral arguments, and after watching the video in its entirety, the trial court excluded the video evidence. The trial court observed that defendant displayed the following unusual behavior in the videos: defendant offered the officers several million dollars to take him to the Capitol, he said he needed to see the governor and mayor, and he told the officers that his girlfriend was going to be killed and needed help. Defendant also told them that he attacked Carlos because he believed Carlos "raped him with others." However, the trial court noted that for the most part, defendant was quite lucid in the video, responding properly and cordially to the officer's questions and waiting patiently in the car. It found that defendant's odd comments were "quite few and limited" in the "very lengthy" time he was in the patrol car, and therefore

4

admitting only the requested excerpts would "create a skewed impression that he suffered from a mental disorder and he couldn't form the intent to perform the attempted murder and the premeditation." The trial court concluded the short video clips "would be misleading in light of the other very rational responses and statements." The trial court further explained that the video in its entirety was inadmissible because it contained numerous hearsay statements offered for the truth of the matter asserted. And although the trial court said defendant could offer evidence concerning defendant's mental state, for example through an expert, it said it would be improper to ask the laypersons of the jury to determine whether defendant had a mental disorder based on the excerpted statements. The court concluded that the video excerpts were inadmissible under Evidence Code section 352 as more prejudicial than probative, as the video was likely to confuse and mislead the jury and to consume undue jury time. It also noted that defendant had presented similar evidence through Carlos, who testified that defendant was acting out of character on the day of the incident.

## The Verdict and Sentencing

The jury found defendant guilty of premediated attempted murder (§§ 664/187, subd. (a)), assault with a firearm (§ 245, subd. (a)(2)), and two counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)). In connection with the attempted murder conviction, the jury found true allegations supporting multiple firearm enhancements (§ 12022.53, subds. (a)-(d)) and that defendant personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). In connection with the assault conviction, the jury found defendant personally inflicted great bodily injury on the victim and personally used a firearm. In a bifurcated proceeding, the jury also found that defendant incurred two prior strike convictions (§§ 667, subd. (e)(2); 1170.12, subd. (c)(2)).

The trial court sentenced defendant to an aggregate 57 years to life, comprised of the minimum base term of seven years for attempted murder plus 25 years for the firearm

enhancement (§§ 667, subd. (e)(2)(A)(iii), 12022.53, subd. (d)), with an additional 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The trial court sentenced defendant to 31 years to life for assault with a firearm, but stayed the sentence per section 654. It also sentenced defendant on two counts of being a felon in possession of a firearm, to six years for the first count and to one year four months for the second count, which both ran consecutive to his 57-year-to-life sentence for attempted murder.

DISCUSSION

I

*Exclusion of Dashcam Video*

Defendant contends the trial court committed prejudicial error and violated his due process rights when it excluded the video of defendant's behavior at the time of his arrest. He argues that exclusion under Evidence Code section 352 was error, because defendant's mental state was the central issue in his trial, and the jury was permitted to determine whether defendant had a mental illness or defect that prevented him from forming the requisite intent to commit premeditated attempted murder. He notes that under Evidence Code section 356, the People could have minimized potential prejudice by playing other portions of the video to clarify or contradict the portions offered by defendant.

Evidence Code section 352 permits the exclusion of relevant evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Additionally, cumulative evidence is inadmissible under Evidence Code section 352 if it threatens to confuse or mislead the jury, or if it would necessitate undue consumption of time. (Evid. Code, § 352; *People v. Burgener* (1986) 41 Cal.3d 505, 525.) "To be cumulative imports that something of like effect is already shown." (*People v. Filson*

(1994) 22 Cal.App.4th 1841, 1850, disapproved of on other grounds by *People v. Martinez* (1995) 11 Cal.4th 434.)

We review a trial court order denying a motion to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.) The trial court's discretionary ruling under Evidence Code section 352 will not be disturbed unless the court acted in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The trial court here acted within its discretion to conclude the video clips were more prejudicial than probative. Defendant proffered brief statements excerpted from various parts of a video that was approximately three hours long. In contrast to those snippets, through most of the video, defendant was coherent and appropriately responsive, sitting patiently in the back of the police car and politely answering the officers' questions. Thus, defendant's scattered statements, without context, had the potential to mislead the jury into believing defendant was incapable of thinking clearly or acting rationally at the time of the offense, when in fact, he was largely calm and lucid.

Nor did the trial court abuse its discretion in concluding the evidence ran the risk of confusing the jury. The trial court was aware the forensic psychologist had not diagnosed defendant with a mental disorder, instead finding his psychosis was likely triggered by drug use. Defendant declined to offer an expert to help clarify the connection to his mental health and thereby reduce the likelihood of confusion. Contrary to defendant's argument, the trial court did not exclude this evidence on the basis that an expert was required on the issue of intent. Rather, the trial court properly found that without an expert's opinion on whether defendant had a mental disorder, the video clips showed the jury a distorted picture of defendant's mental condition, which would confuse rather than aid the jury in determining whether defendant harbored the requisite intent. Thus, although as a general rule, a qualified layperson may testify about a defendant's

7

mental condition (*People v. Townsel* (2016) 63 Cal.4th 25, 51), the trial court was within its discretion to find that without an expert's opinion on whether defendant's statements indicated a mental disorder, the video clips created a significant risk of jury confusion.

We further observe that the evidence in the video clips was cumulative, rendering it of little value in this case. The jury already had evidence that defendant may have been experiencing mental health issues on the day of the attempted murder, which could have affected his ability to form intent. Carlos testified that defendant, who was typically friendly, had recently become angry and had made several nonsensical statements. Carlos also said that on the day of the crimes, defendant had a crazy look in his eyes, and was repeating "you know" and "something about a contract," which Carlos did not understand. Defendant repeatedly asked the workmen and the police, "Do you know who I am?" And one of the few statements that defendant sought to introduce from the videotape – defendant's assertion that Carlos raped him in prison – had already been introduced at trial through Carlos's testimony.

Thus, the evidence in the videotape as to defendant's mental health was cumulative, as there was already evidence before the jury that defendant's conduct was out of character, and, at times, unusual and irrational. Crucially, the admitted evidence also included defendant's asserted motivation for the attempted murder. And, as set forth above, the evidence had the potential to confuse and mislead the jury on the question of defendant's mental state, and was inadmissible in its entirety as a lengthy, largely irrelevant, hearsay-laden video. The trial court was therefore within its discretion to exclude the video clips. As there was no abuse of discretion, the trial court did not violate defendant's constitutional rights to due process or deprive him of a meaningful opportunity to present a defense.

II

*Calculating Defendant's Sentence for Premeditated Attempted Murder*

Defendant next argues that the trial court erred when it calculated the sentence for premediated attempted murder as 57 years to life under Option 3 set forth in section 667, subdivision (e)(2)(A).

Defendant had two prior strikes, and thus was subject to sentencing under the Three Strikes law, which mandates that the trial court utilize one of three possible options for sentencing. Specifically, it provides that the prison term "shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greatest of:"

Option 1: Three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior felony convictions. (§ 667, subd. (e)(2)(A)(i).)

Option 2: Imprisonment in the state prison for 25 years. (§ 667, subd. (e)(2)(A)(ii).)

Option 3: The term determined by the court pursuant to section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with section 1170) of Title 7 of Part 2 [a determinate sentence for a specific number of years], or any period prescribed by section 190 [punishment for murder] or 3046 [life sentence requires a minimum of seven years before parole eligibility]. (§ 667, subd. (e)(2)(A)(iii).)

As relevant here to Option 3, a sentence for willful, deliberate, premeditated attempted murder is "imprisonment in the state prison for life with the possibility of parole." (§§ 664/187.) A prisoner sentenced to life with the possibility of parole may not be paroled until he or she has served the greater of either (1) a term of at least seven calendar years, or (2) a term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence

9

before eligibility for parole. (§ 3046, subd. (a)(1)-(2).) A firearm enhancement under section 12022.53, subdivision (d), adds a consecutive term of 25 years to life to a defendant's sentence.

The trial court used Option 3, finding Option 3 provided for the greatest minimum base term for defendant's indeterminate sentence. The sentence for defendant's attempted murder conviction was life with the possibility of parole (§§ 664, 187) and section 3046 requires a minimum of seven years for an indeterminate life sentence. Thus, the trial court calculated defendant's minimum base term under Option 3 as seven years (§ 3046) plus 25 to life years for the firearm enhancement (§ 12022.53, subd. (d)), for a total minimum base term of 32 years. It then added the 25-year firearm enhancement (§ 12022.53, subd. (d)) to the base term to reach defendant's aggregate sentence of 57 years to life.

Defendant takes the position that per the language in Option 3, enhancements are included in the calculation of the minimum base term only when the underlying conviction provides for a determinate term under section 1170. Because defendant's underlying conviction provided for an indeterminate term under section 3046, he contends enhancements are not included in the calculation of the base term. Thus, he concludes the trial court erroneously included the firearm enhancement when it calculated defendant's minimum possible base term under Option 3; and, without the firearm enhancement, defendant's minimum possible base term under Option 3 would have been seven years, not 32 years. Based on this analysis, defendant claims that the trial court should have instead utilized Option 2, which provides for a 25-year minimum base term, plus the 25 year to life firearm enhancement, resulting in an aggregate term of 50 years to life.

This precise issue was addressed by our colleagues in the Second District in *People v. Miranda* (2011) 192 Cal.App.4th 398 (*Miranda*). The defendant in *Miranda* argued that the trial court erroneously added the firearm enhancement to the minimum seven-year

10

term set forth in section 3046 when it calculated the minimum possible base term under Option 3 of the Three Strikes law. (*Miranda*, at p. 414.) The appellate court disagreed with the defendant, relying primarily on *People v. Jenkins* (1995) 10 Cal.4th 234, which addressed the same argument as applied to minimum parole eligibility period under the habitual offender statute (§ 667.7, subd. (a)(1)). (*Miranda*, at pp. 414-417, discussing *People v. Jenkins*, *supra*, 10 Cal.4th at pp. 250-252.) Like section 667, section 667.7 includes three options for calculating the defendant's minimum period of confinement. (§ 667.7, subd. (a)(1).) One option set forth in section 667.7 "uses virtually identical language" to Option 3 of the Three Strikes law (§ 667), providing that the minimum parole eligibility shall be " '20 years, or the term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046, whichever is greatest.' [Citation.]" (*Miranda*, at p. 415.) Analyzing the language of section 667.7, *Jenkins* held that when sections 190 or 3046 are used in the calculation under the third option of section 667.7, the calculation must also include applicable enhancements. (*Jenkins,* at p. 254.) An alternative rule, it reasoned, could create more lenient sentences under the habitual criminal statute than sentences for non-recidivists. (*Id.* at pp. 251-252.)

Following the *Jenkins* analysis, *Miranda* concluded that the Supreme Court's construction of section 667.7 in *Jenkins* "applies equally to a Three Strikes sentence under section 667, subdivision (e)(2)(A)(iii)." (*Miranda*, *supra*, 192 Cal.App.4th at p. 417.) It noted that this conclusion was bolstered by our Supreme Court's decision in *People v. Acosta* (2002) 29 Cal.4th 105, which stated their agreement " 'with [the defendant's] implicit assumption that *Jenkins* applies to the Three Strikes law and establishes that the calculation under option 3 includes certain enhancements.' " (*Miranda*, at p. 417, quoting. *Acosta*, at p. 115.)

11

Applying *Miranda*'s rationale, we find that that trial court correctly included the firearm enhancement when it determined defendant's base sentence under Option 3 was 32 years, which is greater than the 25 years under Option 2. To the 32 years, the trial court properly added 25 years to life to establish defendant's indeterminate sentence of 57 years to life.

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
MURRAY, J.

_____
KRAUSE, J.

12