Filed 3/11/22  P. v. Valverde CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>WILLIAM RENE VALVERDE,<br><br>    Defendant and Appellant. | C091511<br><br>(Super. Ct. No.<br>STK-CR-FE-2018-0015770) |

After a jury found defendant William Rene Valverde guilty of numerous sexual offenses against his daughter, L., and his girlfriend's daughter, R., the trial court sentenced him to 139 years to life.  On appeal, defendant contends the trial court prejudicially erred by (1) excluding evidence that R.'s mother gave her condoms and instructions on their usage; and (2) permitting improper expert testimony on child sexual abuse accommodation syndrome (CSAAS).  Finding no merit to the first contention and the second argument to be forfeited, we will affirm.

1

A.      *Factual background*

1.      *Victim R.*

i.      *R.'s trial testimony*

R. was born in December 1998.  When she was nine or ten years old, defendant began dating her mother, Sherry H., and moved into their home.  Defendant was a father figure to R.

R. testified that one night in October 2010, she and defendant were alone in R.'s younger brother's bedroom watching cartoons, while Sherry and R.'s brother slept in another room.  At some point, defendant switched from cartoons to a pornographic movie.  Defendant insisted R. get undressed.  R. blocked out some of what occurred that night, but remembers she was eventually in only her underwear, which defendant tried to remove.  At some point, defendant undressed.  He grabbed a gun from the nightstand, pointed it at her face, and told her that she "had to do what he wanted or he was going to kill [her] mom and [her] brother."  Defendant lay on top of her and would not let her get up.  Defendant grabbed R.'s hand and put it on his penis.  With R. lying on the bed, defendant then stood over R. while pulling her head towards his penis, forcing his penis partially into her mouth.  Defendant tried to remove her underwear again, pulling on her legs and knees to force her legs apart as R. tried to keep them closed.  Defendant became very angry.  He again threatened to shoot her mom and brother if she did not comply.  R. could not recall if defendant's penis ever got close to her vagina, but she did recall he touched her vagina under her underwear.

R.'s memory from the evening has some gaps, and she next recalls that defendant fell asleep naked on the bed.  R., shocked and dazed, sat and stared at the alarm clock for hours until she decided she could go to school.  Sherry awoke and found R. sitting on the couch "with the weirdest look on her face, . . . staring at the wall and fully dressed," ready to go to school.  R. testified that she did not tell Sherry what happened on that day

2

because she previously had told Sherry that defendant touched her inappropriately, which Sherry initially reported to the police, obtaining a restraining order against defendant. However, immediately thereafter, Sherry permitted defendant back into the home. Sherry told R. that R. needed to tell the police that she had lied for attention because, if she did not, Sherry would be "really, really sad" and "lonely because [defendant] would be taken away." R. thought that if she told her mother what happened this time, she would just tell her not to say anything, but R. wanted someone to know.

Before the incident in October 2010, R. recalled that defendant touched her vagina and under her shirt multiple times. Once, when R. was watching TV with defendant, he called her beautiful, rubbed the side of her body, put his hand up her dress, and rubbed her "butt." Another time, defendant, alone with R. in her mother's bedroom, put on a pornographic movie and forced R. to move her hand up and down his penis. There is a "pretty big gap" in R.'s memory from that time, but she recalls defendant grabbed her head and forced his penis inside her mouth. R. "kind of blacked out," but remembers that he ejaculated on her face and on the front of her.

### ii. *R.'s interviews*

The morning after defendant sexually assaulted R. in her brother's bedroom at gunpoint, R. reported the assault to her school counselor. The counselor called the police. R. spoke to police officers and a Child Protective Services worker, Charlie Foo, about the incident. R. told Foo about the events of the night before, which he recalled at trial in a manner consistent with R.'s trial testimony. R. also reported that defendant had been touching her inappropriately for the past several months. Foo learned that R. previously reported that defendant had molested her, but recanted because her mother asked her to lie so that defendant would not get in trouble.

A social worker at the Child Advocacy Center (CAC) interviewed R. several weeks later, and R. recounted the incident with defendant in her brother's bedroom. During the interview, R. also recalled an incident in which defendant pulled her dress

3

down and squeezed her leg. Another time, defendant put her hand down his pants and wrapped it around his penis. R. also told the social worker that she was "on [her] second" boyfriend and felt worried about getting pregnant. She described "intercourse" to mean when a person "enter[s]" another person "with other parts," meaning "the penis and the vagina." When asked if she had intercourse with her boyfriends, she said that the first boyfriend was "upstairs outsidies," meaning "[n]ot really in there," and the second one "went a little bit fa[r]ther than that." R. said her first boyfriend was 15 years old and her second boyfriend was 12 years old. She was "[m]aybe really not so sure" if she was pregnant, but had taken two pregnancy tests. She said she had not had intercourse with defendant.

2. *Victim L.'s testimony*

L. is defendant's biological daughter. She was 11 years old at the time of trial. When L. was about nine years old, she did not live with defendant but would visit him approximately three times a week. L. testified to multiple incidents in which defendant touched her. One time, defendant touched her vagina under her clothing, took his penis out, and rubbed it between her legs. Another time, defendant touched L. under her clothing, put her hand on his penis, and moved it up and down. When L. was eight and in the car with defendant, defendant put her on his lap and touched her "private part." L. also recounted a time at a hotel where defendant took off L.'s clothes, touched L.'s vagina, and made her touch his penis. Another time at the hotel, defendant grabbed L.'s head, shoved his penis inside her mouth, and kept his hand on her head to move it up and down. Defendant told her that if she told anyone what happened he would kill her, her sister, and possibly her mother. When she tried to say no to defendant, he would slap her in the face. L. also saw defendant try to touch her little sister inappropriately, but L. stopped him.

When L. was nine, L. told her grandfather and aunt that defendant made her touch him and threatened to kill her, her sister, and her mother. L. reported defendant's

4

behavior to the police and was interviewed by a social worker, at which time she recounted many of the same incidents described in her testimony.

B.      *Verdict and sentencing*

Following trial, the jury found defendant guilty of three counts of oral copulation or sexual penetration of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b)); one count of dissuading a witness by force or threat (Pen. Code, § 136.1, subd. (c)(1)); five counts of lewd or lascivious acts on a child under the age of 14 years (Pen. Code, § 288, subd. (a)); and one count of lewd or lascivious acts on a child under the age of 14 years by force or fear (Pen. Code, § 288, subd. (b)(1)).  The jury also found true that as to each lewd or lascivious act, defendant committed the offenses against more than one victim (Pen. Code, § 667.61, subd. (e)(4)).  In February 2020, the trial court sentenced defendant to an aggregate prison term of 139 years to life, comprised of the upper term of four years for dissuading a witness, plus nine consecutive terms of 15 years to life for the remaining counts.

## DISCUSSION

A.      *The trial court's exclusion of condom evidence*

Defendant first contends the trial court abused its discretion by excluding R.'s statements in her CAC interview that after R. told Sherry that R. was seeing a boy, Sherry bought her condoms and showed her how to use them on a wine bottle.[1]  Defendant argues that this evidence was admissible and not cumulative under Evidence Code section 352[2] because (1) the jury had not yet heard the evidence that the trial court found was cumulative to the condom evidence at the time of the trial court's ruling; and (2) the

---

[1]      Only the redacted interview, which did not include R.'s purported statements about the condoms, was included in the record.  We therefore discern the content of the redacted portion from defense counsel's argument to the trial court.

[2]      Undesignated statutory references are to the Evidence Code.

condom evidence was more probative than her other interview statements indicating she was sexually aware and potentially sexually active at age 11. We find no abuse of discretion.

### 1. *Additional procedural background*

The trial court initially granted the People's motion in limine to exclude the portion of R.'s CAC interview in which she admits that she engaged in sexual activity with her boyfriends. Then, at trial, R. testified that when defendant molested her, he tried to "open [her] legs," and that she "didn't know then that's what he was trying to do, but [she knew] now, being older." When describing a time that defendant rubbed her body, R. testified that she "knew it wasn't right," she "didn't like it," but that she "was a very reserved child and very shy and very scared, so [she] didn't really act on anything." Further, when R. testified that defendant "ejaculated on [her]," the People asked, "And now that you're an adult, you understand what that means?" R. responded, "Yes."

Defendant relied on this testimony to argue that R.'s statements about her boyfriends and sexual history in her CAC interview had become relevant, as those statements contradicted R.'s testimony implying that she did not know about sex and had never participated in sex when defendant molested her. The trial court agreed to allow some questions regarding R.'s recollection of her boyfriends and sexual activity at the time of the CAC interview, and permitted defense counsel to ask R. about pregnancy if R. testified that she had not had sexual intercourse at the time of the CAC interview. During cross-examination, R. testified that she had "childhood crushes," but not a boyfriend at that time. She said she kissed and "made out with them" but that she "never had sexual intercourse with [her] boyfriends at that age." Defense counsel asked if she recalled telling the social worker that she might be pregnant at the time due to sexual intercourse with her boyfriends, and R. responded, "I don't remember saying that, but I was a child.· My definition of 'sex' and 'pregnant' might have been not well informed." R. did not

6

recall describing what she understood "sex" to mean during the interview. On redirect, R. testified that both of her crushes at that time were also her same age or one year older.

Thereafter, the parties discussed the admissibility of R.'s CAC interview. They agreed to introduce portions of the interview in which R. discussed "the two sexual activities . . . with her boyfriends, and their ages, and the pregnancy scare." Defendant also sought to introduce a portion of the interview where R. says that after she began seeing a boy, her mother gave her a "baggie of condoms" that were in a brown paper bag in her dresser, though she did not know if they were still there. In the interview, R. said her mother gave her the condoms, told her "where to put 'em," and made her put them on top of a wine bottle in front of defendant, which she did not like. Defendant argued R.'s statements were relevant because R. "left the jury with the impression that she couldn't possibly be [engaging in sexual intercourse] because she was 11," but her mother's act of buying her condoms and teaching her to use them potentially contradicted that testimony. The People argued the evidence was cumulative under section 352, and the trial court agreed that the issue was "covered sufficiently" by R.'s statements in the interview that she was concerned she might be pregnant. The trial court therefore excluded the statements under section 352 as cumulative and "more time consuming than probative."

At trial, the jury heard portions of the CAC interview where, as discussed *ante*, R. explained her understanding of intercourse, said she had had two boyfriends with whom she had engaged in some sexual activity, and had taken two pregnancy tests.

  2. *Applicable legal standard*

Section 1103, subdivision (c)(1) provides that in a case involving sexual assault, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness." However, the statute permits such evidence if it is relevant to the credibility of the complaining witness. (§ 1103, subd. (c)(5).) In such a case, "[t]he defense may offer evidence of the victim's

7

sexual conduct to attack the victim's credibility if the trial judge concludes . . . that the prejudicial and other effects enumerated in [ ] section 352 are substantially outweighed by the probative value of the impeaching evidence." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708.)

Section 352 permits the exclusion of relevant evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Cumulative evidence also is inadmissible under section 352 if it threatens to confuse or mislead the jury, or if it would necessitate undue consumption of time. (*People v. Burgener* (1986) 41 Cal.3d 505, 525, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

We review a trial court order denying a motion to exclude evidence under section 352 for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.) The trial court's discretionary ruling under section 352 will not be disturbed unless the court acted in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

3.      *Analysis*

We find that the trial court acted within its discretion when it excluded R.'s statements about condoms under section 352.

First, the record supports the trial court's finding that the evidence was cumulative and therefore unduly time consuming. Given R.'s trial testimony, the trial court initially found relevant to R.'s credibility, and thus admitted into evidence, the 11-year-old R.'s responses to CAC interview questions regarding her definition of intercourse, her understanding that intercourse can lead to pregnancy, her sexual activities with her young boyfriends, and her concerns about pregnancy. R.'s statements that she received condoms and instructions from her mother would have served only to imply that R. may have known about intercourse or previously had intercourse at the time of the CAC

8

interview. However, these facts were already established by R.'s statements in her interview that she could generally define intercourse, engaged in sexual acts with her boyfriends, and took pregnancy tests because she thought she might be pregnant. Thus, the trial court did not abuse its discretion by concluding the evidence was cumulative of her other interview statements.

Nonetheless, defendant contends the trial court could not find the condom evidence cumulative here because at the time of the trial court's ruling, the jury had not yet watched R.'s CAC interview. Defendant's argument relies on *People v. Filson* (1994) 22 Cal.App.4th 1841, in which the trial court erred by excluding a recording of the defendant's arrest, finding it was cumulative of the arresting officer's testimony. But in *Filson*, the trial court and defense counsel had not yet heard the recording when the trial court excluded it, nor had defense counsel cross-examined the arresting officer. (*Id*. at pp. 1849-1850.) Thus, the trial court could not have known whether any inconsistencies established by the tape would be the same as any inconsistencies elicited on cross-examination. (*Id*. at pp. 1849-1851.) Here, unlike in *Filson*, the trial court and the parties knew the content of the CAC interview and had already deemed admissible the portions of R.'s interview regarding "the two sexual activities . . . with her boyfriends, and their ages, and the pregnancy scare," when it found R.'s statements about condoms inadmissible. Further, at the time of the trial court's ruling, the jury already had heard R.'s testimony about her boyfriends and sexual activities that the other portions of the CAC interview were intended to challenge. It was therefore not an abuse of discretion for the trial court to find the condom evidence cumulative of other portions of the CAC interview that equally, if not more effectively, might call R.'s testimony and credibility into question.

We also are not persuaded by defendant's contention that the condom evidence had greater evidentiary weight or probative value than R.'s other statements in her interview. In her interview, R. did not state that she actually used the condoms. Nor did

9

R. even know the location of the condoms, as she said her mom may have taken them and she was unsure where they might be. Thus, R.'s reference to the condoms did not provide evidence more probative than R.'s direct statements about her own sexual knowledge and experiences at the time, and her fear she might be pregnant. We find no abuse of discretion.

As the trial court did not err by excluding the contested evidence, defendant was not denied a fair trial or otherwise denied the right to present a defense.

B.  *CSAAS testimony*

Defendant also contends the trial court prejudicially erred by allowing Dr. Anthony Urquiza, the People's expert on CSAAS, to testify beyond CSAAS's permissible limits. Defendant specifically challenges Dr. Urquiza's testimony that the "best predictor" a child will retract an allegation is family pressure on the child, such as a mom pressuring her daughter to recant or else the abuser would go to jail, contending this hypothetical was improperly analogous to Sherry's pressure on R. to retract her allegations. Defendant further contends that Dr. Urquiza's testimony "constructed a mathematical, statistical, and scientific framework" to predict abuse by making statements that, for example, "20 to 25 percent" of children retracted, "three quarters" took longer than a year to disclose, "most" children were abused by a known person in an ongoing relationship, and a "fairly small number" disclosed relatively soon. The People respond that defendant's claim is forfeited by his failure to make timely and specific objections to Dr. Urquiza's testimony, and we agree.

CSAAS is a concept originally developed to educate therapists about the ways in which children commonly respond to the experience of being sexually abused. Although CSAAS testimony is inadmissible to prove that a child was in fact sexually abused, it is admissible to disabuse jurors of myths or misconceptions they might hold about how a child reacts to sexual abuse when it occurs. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.) CSAAS evidence also is admissible to rehabilitate credibility when the

10

defense suggests a child's conduct after an incident is inconsistent with abuse. (*Id*. at p. 1300.) CSAAS evidence tells the jury that certain behavior by a child—such as a delay in reporting—is not inconsistent with the child having been molested. (*Ibid*.; *People v. Housley* (1992) 6 Cal.App.4th 947, 955.)

Before trial, the People filed a motion to admit Dr. Urquiza's testimony on CSAAS. Defendant, in turn, filed a motion in limine to exclude "any expert testimony regarding child sexual abuse" as irrelevant and an undue consumption of time. Following oral argument, in which defense counsel again argued Dr. Urquiza's testimony was inadmissible because it was not relevant, the trial court ruled that Dr. Urquiza could testify so long as he did not testify about the facts of the actual case. Dr. Urquiza accordingly testified at trial consistent with the trial court's ruling, and defendant did not object to any of the statements he now contends were inadmissible.

Defendant's short motion to exclude Dr. Urquiza's testimony as irrelevant did not preserve the specific objections to the testimony he now challenges on appeal. (§ 353; *People v. Williams* (2008) 43 Cal.4th 584, 620; *People v. Nelson* (2012) 209 Cal.App.4th 698, 710-711.) Because defendant did not object to the challenged testimony at trial, he failed to preserve the issue for appeal, and the issue is forfeited. (*Williams, supra*, at p. 626.)[3]

---

[3]    We need not address defendant's passing assertion that his trial counsel was ineffective for failing to object to Dr. Urquiza's testimony at trial, because this contention is not supported by a developed argument. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 ["To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis"]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

## DISPOSITION

The judgment is affirmed.

      KRAUSE      , J.

We concur:

      RAYE      , P. J.

      BLEASE      , J.